(No. 17130.—Reversed and remanded.)
THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* AARON MOSHIEK, Plaintiff in Error.

*Opinion filed October 28, 1926.*

1. CRIMINAL LAW—*an accomplice testifying against defendant may be cross-examined as to offers of leniency.* Where a confessed accomplice turns State's evidence and testifies against the defendant, the defendant is entitled to cross-examine the witness as to any promise of leniency that may have been offered to induce him to so testify; and where the witness has stated that no direct promise of leniency was made but that he understood that some leniency was to be shown him, the court should not limit the cross-examination to the mere statement of the witness' conclusion but should permit the defendant to cross-examine the witness as to the facts upon which he bases his conclusion.

2. SAME—*when witness should not be asked as to his indictment for crime.* A witness testifying for the defendant in a prosecution for forgery should not be asked as to whether he was not also indicted for forgery, where there is no proper showing in the record that the witness was ever convicted of the crime of forgery or of any other felony or infamous crime.

3. SAME—*when evidence of subsequent offenses is not admissible in prosecution for forgery.* In a prosecution for forgery, an alleged accomplice who has turned State's evidence should not be permitted to detail other forgeries as having been committed by

himself and the defendant subsequent to the offense charged in the indictment, where there is no proof of any prior similar offense committed by the defendant and where no conspiracy or agreement is proved to have been formed between the defendant and the witness to commit the forgeries testified to, as evidence of subsequent offenses is not admissible to prove guilty knowledge or intent in the absence of proof that the defendant has formerly committed a similar offense. (*People* v. *Hobbs,* 297 Ill. 399, followed.)

WRIT OF ERROR to the Criminal Court of Cook county; the Hon. W. J. LINDSAY, Judge, presiding.

EDWARD MAHER, (BERNHARDT FRANK, of counsel,) for plaintiff in error.

OSCAR E. CARLSTROM, Attorney General, ROBERT E. CROWE, State's Attorney, and MERRILL F. WEHMHOFF, (HENRY T. CHACE, JR., and EDWARD E. WILSON, of counsel,) for the People.

Mr. JUSTICE DUNCAN delivered the opinion of the court:

Plaintiff in error, Aaron Moshiek, (hereinafter called defendant,) was convicted in the criminal court of Cook county for the crime of forgery and was sentenced to imprisonment in the Illinois State Reformatory at Pontiac for an indefinite term, not to exceed fourteen years, the maximum penalty fixed by the statute. The indictment is in two counts, the first charging forgery of a check dated January 15, 1924, payable to "cash," for $750, and drawn on Franklin Trust and Savings Bank, purporting to be signed and endorsed by S. A. Bernbach. The second count charges the uttering and passing of the check aforesaid. The defendant has sued out this writ of error for a review of the record.

The chief witness for the State was Benjamin B. Blaz, an accomplice, who testified, in substance, as follows: He had known the defendant for more than a year prior to January 15, 1924, but was not intimate with him. On

that date he met the defendant at New Southern Hotel, room 613, and there was no one else there present with them. After talking with the defendant for about an hour he finally agreed with him to accept his proposition to cash a check for him for one-third of the proceeds thereof if he succeeded in cashing the same. The defendant then opened a drawer in a desk in the room aforesaid and took therefrom a book of blank checks and with a pen wrote the forged check aforesaid, dating it at Chicago, January 15, 1924, and signed and endorsed same by the name of S. A. Bernbach, the body of the check being in this language: "Franklin Trust and Savings Bank, pay to the order of cash, $750." He saw the defendant write in the blank space on the check all the words that were in writing, "cash, $750," saw him write the date on the check, and saw him sign it and endorse it as above stated. He knew the defendant as A. P. Foster. On his cross-examination he testified that on January 15 Moshiek called him on the telephone at his home and told him that he was living at the New Southern Hotel and would like to talk to him. Witness went directly to that room and the defendant asked him if he wanted to make some money. He told him he did. The defendant then told him he had a good proposition, and that his proposition was that he would give him one-third split on the check aforesaid. He then testified that after the check was written by the defendant he and the defendant rode in a taxicab to Thirty-fourth street and Michigan boulevard, and that there Moshiek pointed to a bank located on the corner of Thirty-fifth and Michigan and told him that all he would have to do was to present the check to that bank for payment and he would get the money on it. The witness then went to the bank, which was the Franklin Trust and Savings Bank, and presented the check to the paying teller, who took the check, compared the signature thereon with signature cards, conversed with some man behind the cage, and then counted out to the wit-

ness seven $100 bills and $50 in currency and handed him the money. He then took the money to the taxicab and handed it to the defendant, who said that it was good work. They then drove to the Hyde Park Bank, at Fifty-third and Lake Park avenue, where he cashed a $100 bill, got change for same at the direction of the defendant and gave the $100 in change to the defendant. The defendant then counted and gave to him $250 as his one-third. They then walked east on Fifty-third street to the Western Union telegraph station, where the defendant sent two telegrams and two money orders totaling $175,—one to a man called Simons, in New York, and the other to Anita LaPierre. The witness sent a money order and a telegram at the same station to his wife for $100. The witness went back the next day at nine o'clock to room 613 aforesaid and learned that there was a man sleeping in the bed there with the defendant, called Frank, but he did not know his last name.

Samuel A. Bernbach testified that his purported signatures on the check testified about by Blaz were forgeries, and the paying teller of the Franklin Trust and Savings Bank corroborated the testimony of Blaz as to his cashing the check at that bank and identified Blaz in the court room as the party cashing the check. A clerk of the Western Union Telegraph Company employed at the Hyde Park office corroborated Blaz's testimony to the effect that three money transfers were made, two of which were signed by Al P. Foster, one payable to Philip Simons, of New York, for $175, and one payable to Anita LaPierre, of New York, for $25, and also one for $100 signed by Ben B. Blaz and payable to Mrs. Ben B. Blaz, Chicago, for $100, and all dated January 15, 1924. Her testimony and the books of the telegraph company show that these transfers or orders were made by the Western Union Telegraph Company through her as agent. The money orders sent by defendant, according to her testimony, totaled $200, instead of $175 as testified to by Blaz. She was unable to iden-

tify the defendant as the party who purchased those two orders for money. Walter J. Donovan, manager of the New Southern Hotel, testified and introduced the books or registers of the hotel showing the arrival and departure of guests, which evidence showed that A. P. Foster arrived at that hotel January 1 and departed January 22, 1924, and that he occupied room 637.

Over the objections of the defendant the witness Blaz and a number of other witnesses were allowed to testify in great detail concerning three other forgeries committed by the defendant after the forgery of the $750 check charged in the indictment, the substance of which evidence is the following: By the witness Blaz, that on January 16, 1924, he again met the defendant at his said room 613 in the New Southern Hotel, where the defendant wrote a check on the Schiff State Bank, dated January 16, 1924, payable to the order of M. Jaffe, for $1209, and signed by Sam Rubin Auction House by Joe Baron, and endorsed, "M. Jaffe," "O. K., C. F. Starr," "Samuel Grossman." There was another party, by the name of Frank, in the room at that time, and the defendant directed witness to take the check to the bank and cash it, representing himself to be M. Jaffe, and directed Frank to proceed to a telephone booth while Blaz was in the bank and telephone the alleged makers of the check in order to keep their wire busy and prevent the bank from inquiring of them about the check. All three of them then went to the vicinity of the Schiff State Bank, and as witness went into the bank Frank went into a telephone booth to do the telephoning. Witness was not able to get the check cashed but did succeed in having the cashier O. K. the signature and certify the check. All three of them then went to a drug store, where the defendant wrote the endorsement, "O. K., C. F. Starr," and directed witness to return to the bank and cash it. He was unable to get the cashier to cash it. On the following morning witness went to defendant's room

aforesaid and defendant telephoned to two men, who arrived at the room in about an hour. One of these men handed defendant the check on the Schiff State Bank and said, "It will go over to-day." The defendant then wrote the endorsement on the check, "Samuel Grossman," and told witness and one of the two other men to take the check to Foreman Brothers' National Bank, where Grossman had an account, and cash it, telling the other man to telephone Grossman and keep him busy on the wire while witness was cashing the check. Witness and the other party did as directed and succeeded in cashing the check, and the witness then gave the proceeds thereof to the defendant, out of which he paid the witness $300 as his share. On January 22, 1924, witness met defendant and one Belson, and Belson asked defendant why he had not "put a check over on C. F. Starr's name." Defendant told Belson to telephone and inquire as to Starr's balance in the bank. Belson reported that Starr was good for several hundred dollars. The three then went to a shoe shining parlor at Fifty-third and Lake Park avenue, near the Hyde Park State Bank. Belson then went to that bank and obtained some blank checks, which he took to the defendant at the shoe shining parlor. Defendant then placed the pad of checks across his knee and wrote a check for $300, dated January 22, 1924, and signed with the name "C. F. Starr," payable to the order of "cash," and endorsed C. F. Starr's name on the back of the check. Witness, over his protestations, was persuaded to take this check to the bank and attempt to cash it. He finally presented the check to the paying teller of the bank and was there arrested by the police officer of the bank.

The State introduced the testimony of Sam Rubin, Joseph Baron and Samuel Grossman, who testified that their signatures on the Schiff State Bank check were forgeries. Also the testimony of two assistant cashiers of the Schiff State Bank and the paying teller of the Foreman Brothers'

National Bank, who testified to the appearance of Blaz at their respective banks at the days mentioned in his testimony and corroborated his testimony as to what took place there when he presented the same for certification and for payment. The special police officer of the Hyde Park State Bank testified to Blaz's arrest by him while he was running away from the bank after Blaz noticed the cashier conferring with him about the check.

. It further appears from the testimony of Blaz that he was arrested in Spokane, Washington, in March, 1925, on a charge of passing another forged check written by the defendant for $100, the defendant having gone to that city with him. The witness was tried and convicted for attempting to pass and cash that check and sentenced to imprisonment from one to twenty years, which was later suspended. While in prison there he was visited by a representative of Burns Detective Agency. He told the representative of that agency that he was ready to make a confession as to the forging and the passing of the forged checks in Chicago and thereupon was brought back to Chicago, where he talked with the State's attorney and promised to become a witness in this case against the defendant, and that the witness expected to obtain leniency under the indictments charging him with the crimes that he had committed by reason of the forgery and the uttering and passing of the three forged checks forged by the defendant in Chicago. He further testified that there was no direct promise made by the State's attorney's office, by the Burns Detective Agency or by anybody from the police department that he would receive leniency or favors for testifying in this case but that he understood that some leniency was going to be shown to him, and that he did not remember what was said to him by John Norcott, of the Burns Detective Agency, and by the police when they were talking to him at the Burns Detective Agency at Chicago. He was then asked, on cross-examination by defendant's counsel, why he un-

derstood that there would be some leniency shown him, and was in substance asked to tell what particular thing or transaction or conversation he based his conclusion on. The State's counsel, when these questions were asked, interrupted with these words: "Just a minute." Thereupon the court, without waiting for an actual objection to be interposed, promptly announced that he sustained the objections to those questions and would only permit the witness to say that he expected to receive some leniency, without giving any intimation as to what it was or upon what statement or promise he had based his conclusion that he would receive leniency.

The only witness for the defendant except the defendant himself was Robert T. Wilson, who testified that he was a prisoner in the county jail; that he knew John H. Norcott, of the Burns Detective Agency, and saw him at the First Precinct station, Chicago, and on September 5 had a conversation with him in reference to giving testimony against the defendant; that Norcott wanted him to say that the defendant wrote the checks aforesaid, and he told him that he could not do it; that he offered the witness immunity and told him he would get him out of jail on bond, and that it was worth $1000 to him if he would get on the witness stand and testify against defendant. He told Norcott that he could not do it and he did not want to perjure himself. He further testified that his wife was present at the conversation with Norcott, and that he heard a conversation between Norcott and his wife in which he told her that he would have the witness out of jail on bond the same day if he would comply with his wishes in testifying in the Moshiek case. Norcott also told him that he had him "dead to rights" and that he could make it hard for him. He had known the defendant only since August before the trial,—that is, since August, 1924, after the alleged forgeries aforesaid. The witness was then asked if he was not indicted for forgery, and was compelled to answer by

the court, over the objections of the defendant, that he was indicted for forgery, the court waiting until after the witness had answered the question before he ruled on the objection. The witness had already answered, on cross-examination, that he had not passed any checks while acting in connection with the defendant.

The defendant testified that he was twenty-two years old and that he was born in the city of Chicago, and that he knew Blaz, the State's witness, in the early part of August, 1923, which was the first time he ever met him, and that he saw Blaz on January 15, 1924, at the Chicago Beach Hotel lobby. He positively denied that he saw Ben Blaz on that date at the New Southern Hotel and did not see him at room 613 at that hotel, and that there never was such a meeting between them as Blaz testified. He denied absolutely writing the forged check in question or of having anything to do with that check, and denied every criminating circumstance, fact or conversation concerning that $750 check and the forging and the passing of the same as testified to by Blaz, and denied paying him $250 for his work in passing that check or of getting him to get change for the $100 bill. He testified there was no such man in his room as "Frank" at that date, and that he did not know any man named Frank that was living with him or that was in his room at that time. He also denied Blaz's entire testimony as to the forging of the other checks testified to by Blaz and all knowledge concerning the same. He also admitted that he resided or stopped at the New Southern Hotel between the 9th and 22d days of January, 1924, under the name of A. P. Foster, and that on January 15, 1924, he sent $25 to Anita LaPierre in New York City and on the same day $175 to Philip Simons in New York City, but that he did not know whether Ben Blaz sent any telegram or money at that time; that he was in the office, at that time, of the telegraph company but was not with the defendant.

The judgment in this case must be reversed for the various errors committed by the court in ruling on the evidence and for other errors herein indicated. We shall not, therefore, comment upon the evidence further than to call attention to the fact that the guilt of this defendant depends almost entirely upon the testimony of the witness Blaz, who is corroborated in no particular in his testimony against defendant except as to the fact that the defendant made the transfers or transmission of money through the telegraph office to the parties in New York and that Blaz transmitted money at the same time to his wife, on January 15, 1924. The defendant admitted that he went under an assumed name and that he was registered at the New Southern Hotel in Chicago during the time that the check was forged for $750. The evidence abundantly shows that Blaz was guilty of cashing the forged check in question and the check for $1209 and that he attempted to pass the third check that was forged in Chicago, and all the evidence that is offered by the State as to those checks was merely in corroboration of Blaz's testimony as to his own guilty conduct. No one of the three witnesses that Blaz testified took part in the cashing or aiding in the cashing of the $750 check was offered as witnesses for the State or their absence accounted for by the State, and the same is true as to the parties named by Blaz who assisted in planning the cashing of the other checks that were forged and cashed in Chicago.

The court erred in restricting the cross-examination of the witness Blaz by merely permitting him to state that he expected leniency in this case, and there are other minor particulars in which the court erroneously restricted the cross-examination of Blaz by the defendant. The defendant was entitled to have the jury informed of the facts and what promises had been made to him upon which he based his conclusion that he would receive favors or be leniently dealt with for testifying against the defendant. It

appears from Blaz's testimony that he had a vivid memory as to his every act and conduct and as to the defendant's act and conduct connected with the forged notes, and that there was only one fact which he failed to remember, and that was the fact or facts as to what the Burns Detective Agency's agent, Norcott, had told him or promised him and as to what the police who were acting with Norcott in obtaining his confession had promised him in case he would testify in this case against the defendant. It was therefore incumbent upon the court to permit the defendant's counsel to go into a searching cross-examination to determine what the facts were as to the promises made to him by the police or by Norcott or by the State's attorney in the way of favors or promises of leniency, inasmuch as the record shows that all three of those parties were operating together to obtain his confession and his testimony against the defendant.

But for the fact that the record discloses that the witness Norcott was operating with the police and the State's attorney in securing the confession of the witness Blaz and his testimony against the defendant, Wilson's testimony for the defendant that Norcott offered to grant him immunity and pay him $1000 to testify against the defendant would not have been admissible against the People, but the facts in the record make Wilson's testimony material, and it was not even objected to by the State. The State did not offer Norcott as a witness to dispute the testimony of Wilson, although Norcott was in the court room at the time Wilson was testifying and was pointed out by Wilson as the party who tried to hire him to testify against the defendant. The State's attorney, instead of offering this rebuttal testimony if it was forthcoming, sought to discredit the testimony of Wilson by unfair and unlawful means, by asking the witness if he was not charged with forgery and if he was not guilty of forgery. There is no claim whatever, so far as this record shows, that Wilson was ever convicted of the crime of

forgery or of any other felony or infamous crime. It was the State's privilege to show, if that was the case, by his examination of Wilson, that Wilson and the defendant were associated together in the jail or that they were in communication with one another in the jail and how he came to testify for the defendant, but that is the extent to which the cross-examination of Wilson should have gone, and the court erred in compelling him, over the objections of the defendant, to testify that he was also indicted for forgery.

There was no conspiracy proved or agreement between the defendant and Blaz that on January 15, 1924, they were to commit a series or number of forgeries or the forgery charged against the defendant and the subsequent forgeries proved or attempted to be proved. In other words, the three forgeries committed in Chicago, as shown by this evidence, were separate and distinct acts and were different crimes of forgery. The crime charged in this indictment is the first of those alleged crimes, and the two subsequent crimes committed in Chicago as testified to by Blaz and other witnesses, and the evidence concerning the forgery in another State, were inadmissible as evidence against this defendant, and the court committed reversible error in admitting such evidence. This court in the case of *People* v. *Hobbs,* 297 Ill. 399, has definitely and finally settled the question that the evidence of the commission of subsequent crimes is not admissible for the purpose of proving guilty knowledge or intent in the absence of proof that the defendant has formerly committed a similar offense, and that his first offense must be held to be the beginning of his criminal career, and that his intent in the commission of his first offense may not be presumed from his commission of subsequent similar and distinct offenses. All the authorities known to bear on that question were then reviewed, and we distinctly stated that all prior decisions of this court containing statements apparently contrary to the *Hobbs case* were made in cases where the point in question was not

distinctly raised and that this court would not consider them as binding. The *Hobbs case* was tried in Cook county, and the prosecuting authorities there had distinct and positive notice that the decision in the *Hobbs case* was a final decision of this court on that important question, and there is no excuse, so far as we know, for the flat refusal in this case to avoid the error in this particular that has occurred in this case.

The defendant also complains of error in the giving of instructions by the court. One of the instructions complained of was given for the People upon the question of alibi, which had no place in this record. There was absolutely no defense or attempted defense of an alibi, as the defendant admitted that he was a boarder at the New Southern Hotel at the time the forgery with which he was charged was testified to by Blaz to have been committed by him. The defense was a square denial that he forged the check or had anything to do with its forgery or with the uttering of it.

There was another instruction given by the People which was a literal copy of our statute defining forgery and naming the various character of forgeries. Much of this statute had no application whatever to the alleged offense committed in this case, and while we would not be inclined to hold that it is reversible error, yet it is not only a statement or copy of the statute applicable to the charge in this case, but it contains references to many other things that are not applicable to this case, and no such an instruction should be given in any case in the form as it is here presented.

Further errors are complained of, but as they may be avoided in another trial it is not necessary to here discuss or pass on them.

For the foregoing reasons the judgment of the court is reversed and the cause remanded.

*Reversed and remanded.*