THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* RONALD L. NORWOOD, Defendant-Appellant.

(No. 55412;

First District—April 24, 1972.

Gerald W. Getty, Public Defender, and Hume, Clement, Hume & Lee, Ltd., both of Chicago, (James J. Doherty, Assistant Public Defender, and Gerald D. Hosier, of counsel,) for appellant.

Edward V. Hanrahan, State's Attorney, of Chicago, (Robert A. Novelle and James R. Truschke, Assistant State's Attorneys, of counsel,) for the People.

Mr. JUSTICE LYONS delivered the opinion of the court:

Following a bench trial, Ronald L. Norwood was found guilty of the offense of murder. (Ill. Rev. Stat. 1969, ch. 38, par. 9—1.) Judgment was entered on the finding and he was sentenced to a term of not less than 14 nor more than 20 years in the Illinois State Penitentiary. On appeal he contends:

"1) That the judgment of conviction must be reversed as a matter of policy due to the prosecution's having knowingly withheld evidence material to the question of his guilt;

2) That he was improperly limited in his cross-examination of the State's primary witness due to the trial court's erroneous refusal to require the State to produce the witness' prior police record; and

3) That he was not proven guilty beyond a reasonable doubt."

The bulwark of the State's case rests in the testimony of William Washington, a minor, which may be summarized as follows. The defendant appeared at this witness' home between 11:30 A.M. and noon on January 11, 1970. They wandered through the neighborhood together, returning to the witness' apartment at one point and entering a meat market at another. Washington carried a .38 calibre revolver containing five cartridges, three of which were expended. He admitted that he had previously stolen the weapon and fired the expended cartridges.

Between 1:15 and 1:30 P.M., as they were walking on 38th Street between Langley and Cottage Grove Avenues, defendant requested that he be allowed to carry the weapon. Washington complied with the request and surrendered it to him. Shortly thereafter and in the vicinity of a school yard they encountered the deceased, Mr. Jackson Jones. Defendant suggested that they rob Mr. Jones, but Washington refused, stating that Mr. Jones was known to him. When defendant then stated that he would perform the act himself, Washington began to walk away.

Washington heard the deceased refuse to surrender his money and then heard a single gunshot. He turned and saw Mr. Jones lying on

the ground. Defendant threw him the gun and proceeded to enter the deceased's pockets. Washington noticed two other individuals near the scene: a woman was standing approximately 25 feet away and a man on Ellis Avenue.

The witness fled the scene and defendant followed. He first ran down the alley located between Ellis and Lake Park Avenues and there discarded the gun in a garbage can. He and defendant then continued their flight on foot to Oakwood and Lake Park Avenues where they boarded a C.T.A. bus. While on the bus, defendant gave him $6 as a share of the proceeds of the robbery. They then proceeded to defendant's home on the west side of the city via C.T.A. train, arriving there at approximately 3:00 P.M.

They remained at defendant's home until approximately 5:30 P.M., occupying themselves by listening to records, except for a short period of time when they went out to get something to eat. Thereafter they returned to the south side of the city and visited with friends until 10:30 P.M. when they returned to Washington's home. Defendant spent that night at Washington's home.

In addition to his denial of any knowledge of the offense with which he was charged, defendant offered the defense of alibi. Testifying on his own behalf, he offered the following chronology of events on January 11, 1970.

He did not rise until after 11:00 A.M. on the morning of the date in question. At 11:30 A.M., following breakfast, he telephoned his girl friend and spoke to her for about an hour. At approximately 1:30 P.M. his mother telephoned with instructions for him to remove some meat from the freezer. Shortly thereafter William Washington telephoned. They spoke for approximately 25 minutes and Washington invited him to come to the south side. Defendant dressed and eventually left for the south side after 2:00 P.M., arriving in Washington's neighborhood sometime after 3:00 P.M.

When he located Washington at the home of a friend it was almost 4:00 P.M. They talked for a while and then it was suggested that they journey to defendant's home and "get high." They arrived at his home at approximately 5:30 P.M., bringing food and drink with them. No one was home at that time. Defendant called his girl friend again. Later they returned to the south side where they visited a friend named Sam and ultimately returned to Washington's home where he spent the night.

Levinia Norwood, defendant's mother, also testified for the defense, corroborating defendant's testimony concerning the telephone conver-

sation between them at approximately 1:30 P.M. She also testified that she arrived home at 5:00 P.M., found no one there, and left to visit a friend.

Sheila Hardin, defendant's girl friend testified to having had a telephone conversation with defendant between the hours of 10:00 A.M. and 2:00 P.M. on the date in question. This conversation, which was fairly long, was the only one which she had with defendant on that date. During the course of that conversation defendant informed her that William Washington was with him.

The final witness called by the defense was Bernard Banahan, a Chicago police officer who investigated the homicide of Mr. Jackson Jones. He testified that he located a witness to the crime, one Willie Mae Manning. She made a photographic identification of William Washington and stated that she could also identify the other youth involved in the homicide although she had never seen him previously. To the best of this witness' knowledge, however, she had never been given an opportunity to view either a photograph of or the person of defendant.

■■ Defendant first contends that the judgment of conviction cannot stand due to the State's failure to call Willie Mae Manning as a witness. This contention is founded upon the proposition that the failure to call her as a witness supports the conclusion that her testimony would be favorable to the defense and unfavorable to the prosecution, thus warranting a finding of not guilty as a matter of law. In essence, defendant here contends that the failure of the State to call a particular witness raises an irrebuttable presumption that the testimony of the absent witness would serve to exonerate the defendant, or so seriously impairs the evidence presented by the State as to eliminate the possibility that the State's burden of proof could be satisfied. This contention is neither new nor novel. It is now well established that the State is under no compulsion to call all witnesses to the commission of an offense, and that being the case no such presumption arises as a matter of law from the failure to call a particular witness. See *People v. Jones*, 1964, 30 Ill.2d 186, 195 N.E.2d 698; *People v. Adorno*, 1970, 126 Ill. App.2d 98, 261 N.E.2d 443; *People v. Lawrence*, 1970, 126 Ill.App.2d 202, 261 N.E.2d 459.

■■ It is next contended that the trial court's refusal to require the State to provide defense counsel with the past police record of the witness Washington was error which precluded exploration of the possibility that an agreement had been reached between the State and Washington in exchange for his testimony. Washington was a minor and therefore his police record was protected from publication by section

2-8 of the Juvenile Court Act (Ill. Rev. Stat. 1969, ch. 37, par. 702—8.) Under the terms of the statute the information which defense counsel requested could not be produced.

■■ Defendant's final argument, that he was not proven guilty beyond a reasonable doubt, essentially presents a question as to the credibility of the witnesses. While it is true as defendant points out that the testimony of Washington must be viewed with suspicion in view of his close association with the offense, it does not follow that his testimony was inherently unreliable. On the other hand, the interest of both the defendant and his mother in the outcome of the proceedings could properly be considered by the trier of fact in weighing their credibility. The only other defense witness who testified with respect to the alibi defense contradicted defendant both as to the number of telephone conversations which she had with him on the date in question and as to the time at which he was in the company of Washington. On the basis of this record we cannot say that the trial court erred in its assessment of credibility in favor of the State. Accordingly the judgment of the Circuit Court is affirmed.

Judgment affirmed.

GOLDBERG, P. J., and BURKE, J., concur.