(No. 45196.—

THE PEOPLE OF THE STATE OF ILLINOIS, Appellee,
v. RONALD L. NORWOOD, Appellant.

*Opinion filed May 21, 1973.*

254

JAMES J. DOHERTY, Public Defender, of Chicago (GERALD D. HOSIER and HUME, CLEMENT, HUME & LEE, LTD., of counsel), for appellant.

WILLIAM J. SCOTT, Attorney General, of Springfield, and BERNARD CAREY, State's Attorney, of Chicago (JAMES B. ZAGEL, Assistant Attorney General, and KENNETH L. GILLIS and WILLIAM D. WOLTER, Assistant State's Attorneys, of counsel), for the People.

MR. JUSTICE SCHAEFER delivered the opinion of the court:

The defendant, Ronald L. Norwood, was convicted of murder after a bench trial in the circuit court of Cook County, and was sentenced to imprisonment for not less than 14 nor more than 20 years. The appellate court affirmed (*People v. Norwood (1972), 5 Ill. App. 3d 130*), and we allowed the defendant's petition for leave to appeal.

The issues raised on this appeal concern allegedly improper and unconstitutional restrictions upon defense counsel's efforts to impeach the State's principal witness.

Shortly after 2 o'clock on Sunday afternoon, January 11, 1970, Jackson Jones was shot and killed in a schoolyard located at 37th Street and Ellis Avenue in Chicago. The defendant's cousin, William Washington, who was 15 years old, testified that on that day the defendant, age 17, came to his home on the south side of Chicago between 11:30 A.M. and noon, and that the two walked around the neighborhood for a while. The defendant asked if he could carry the .38-caliber revolver that Washington had in his pocket, and Washington gave it to him. They continued to walk around until just after 2 P.M. when they encountered Jones. The defendant suggested that they rob him, but Washington testified that he refused because he

was acquainted with Jones, whereupon the defendant said he would do it himself. Washington began to walk away, and when he was about 30 feet away from the defendant he heard Jones refuse to give up his money and then heard a shot. When he turned he saw Jones lying on the ground. The defendant then threw him the gun and took $13 from the deceased's pocket. Washington testified that they fled down an alley, where he threw the gun into a garbage can. The defendant later gave him $6 of the money he had taken from Jones.

The defendant denied that he shot or robbed Jones. He admitted that he was in the area of the murder on the day in question, but stated that he did not arrive there until after 3 P.M. He testified that he was at his west-side home that morning until 2 P.M., when, in response to a telephone conversation he had just had with his cousin, William Washington, he left to go to his cousin's home. The defendant's testimony was corroborated by that of his mother, who testified that she had telephoned him at home at approximately 1:35 P.M. and that he had answered. The defendant's girl friend, Sheila Harden, testified that he had telephoned her from his home on the day of the crime. The defendant had testified that he called her around 11:30 A.M. and again at 5:30 P.M. She did not remember the second call, and was unable to remember the exact time of the first, but said that it was some time between 10 A.M. and 2 P.M. She also testified that during the conversation the defendant said that his cousin Billy was with him. This contradicted the defendant's testimony.

It is evident from this summary of the evidence that the credibility of William Washington was critical, for if his testimony was not believed the defendant could not have been convicted. All of the defendant's contentions in this court center about his charge that the trial judge improperly restricted his efforts to attack Washington's credibility. We approach those contentions with the following

observations in mind: "The testimony of an accomplice is competent evidence, and, although uncorroborated, may be sufficient to sustain a conviction if it is of such a character as to prove guilt beyond a reasonable doubt. It is always, however, subject to grave suspicion and should be acted on with great caution. (*People v. Harvey, 321 Ill. 361; People v. Johnson, 317 id. 430.*) A defendant against whom an accomplice in the crime testifies is therefore entitled to cross-examine such witness and interrogate him freely as to his motives, bias and interest, his relation to the crime and the persons connected with it, and any matters which tend to impeach his fairness or impartiality." *People v. Maggio (1927), 324 Ill. 516, 529;* see also, *People v. Baker (1959), 16 Ill.2d 364; People v. Derrico (1951), 409 Ill. 453; People v. Moshiek (1926), 323 Ill. 11.*

The defendant first asserts that he was misled because an order which directed that the "past police record" of the witness Washington be produced and be made available to him at the trial was not complied with. We have examined the record and we find no such order. The order that was entered upon the defendant's motion for discovery read as follows: "It is further ordered that all Grand Jury minutes and all police reports pertinent to this indictment be made available at the time of trial." We do not read the defendant's request for discovery as including the past police records of the witness unconnected with this indictment, but even if those records were requested, it is clear that the trial judge did not order them produced. The record thus does not sustain the contention that the defense was hampered by an unexpected change of position on the part of the trial judge.

The broader contention, that the defendant's cross-examination of Washington was improperly restricted, presents a more serious problem. The basic objective of that cross-examination was to impair the credibility of the witness on the ground that he had been promised leniency in exchange for his testimony against the defendant in this

case. And while the decisions that have been cited show that it has consistently been held that proof of arrests, indictments and charges of commission of crimes are not admissible to impeach a witness by showing his bad character, they also show that a defendant is entitled to have the trier of the fact informed as to any promises of leniency that may have been made to the witness, whether those promises related to the present offense or to other pending charges.

The restrictive rulings of the trial judge seem to have been based largely on the proposition that the witness was a minor and therefore his police record was protected from publication by section 2—8 of the Juvenile Court Act (Ill. Rev. Stat. 1969, ch. 37, par. 702—8), and the appellate court affirmed on the ground that under the terms of that statute the information which defense counsel requested could not be produced.

Section 2—8 of the Juvenile Court Act provides:

"(3) The records of law enforcement officers concerning all boys under 17 and all girls under 18 must be maintained separate from the records of arrests and may not be open to public inspection or their contents disclosed to the public except by order of the court or when the institution of criminal proceedings has been permitted under Section 2—7 or such a person has been convicted of a crime and is the subject of pre-sentence investigation or proceedings on an application for probation."

In our opinion this statute is not to be construed as prohibiting access to the records of juvenile delinquents when those records are sought in order to impeach the credibility of the juvenile as a witness by showing a possible motive for testifying falsely. The terms of the statute show that the prohibition against disclosure is not absolute, and as Wigmore has pointed out, "It would be a blunder of policy to construe these statutes as forbidding the use of such proceedings to affect the credibility of a juvenile when appearing as witness in another court." 3 Wigmore, Evidence (3d ed. 1940) sec. 980.

We hold, therefore, that the statute did not bar the disclosure of the juvenile records of the witness insofar as they might be relevant to the defendant's claim that the witness's testimony was attributable to lenient treatment which he had received or had been promised. This conclusion makes it necessary to consider the precise respects in which the defendant's efforts to establish circumstances that might show bias were impeded.

The witness testified that he lived at Valley View Boys' School, but the court sustained the prosecution's objection to a question as to whether that was a State institution. The court also sustained objections to questions as to whether, at the time of his arrest for this offense, the witness was on probation or parole from the juvenile court for a different offense. Objections were also sustained to questions concerning whether the witness had confessed to burglarizing the home from which the murder weapon and other guns had been stolen a few days before the present offense was committed. The witness testified that the murder charge against him in connection with the present crime had been dropped, but that he was being held and was "doing time" on the armed-robbery charge. The court refused to permit the witness to state what sentence had been imposed on the armed-robbery charge. The assistant State's Attorney stated, however, that the witness was in custody in connection with a different matter. This contradiction was not explained, and the disposition of other offenses committed by the witness at about the same time as the present one was not disclosed.

Detective Banahan, the investigating police officer, who was called as a witness by the defendant, testified that there had been a shooting in the vicinity of 39th and Cottage Grove on the Friday preceding the murder, and that in the course of the investigation of that matter a gun had been recovered from the apartment where the witness Washington lived. The officer also testified that he had found a woman who had witnessed the killing from her

front porch, and had recognized one of the participants although she did not know his name. The one whom she had recognized was Washington, and she subsequently selected his picture from a group of 50 photographs of youthful offenders. The officer testified that she said that while she had not previously seen the other participant, she could recognize him. She had not, however, ever been asked to identify a photograph of the defendant, or the defendant himself.

There is no doubt that if Washington had been an adult the defendant would have been able to cross-examine as to any agreement in exchange for his testimony. As we stated in *People v. Barr (1972), 51 Ill. 2d 50:* "The accused has a right to question a witness concerning any matter which goes to explain, modify, or discredit what he said on direct examination [citations], and the fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to indicate that his testimony might be influenced by interest, bias, or a motive to testify falsely. [Citation.] Furthermore, though the scope of cross-examination is generally within the trial court's discretion, 'the widest latitude should generally be allowed the defendant in cross-examination for the purpose of establishing bias.' " (51 Ill.2d at 51-2.) In the present case the only witness who has implicated the defendant was the witness Washington, and in our opinion it was error to restrict his cross-examination. The judgments of the appellate court and circuit court are therefore reversed, and the cause is remanded for a new trial.

*Reversed and remanded.*