THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* SONNY M. PORTER, Defendant-Appellant.

First District (2nd Division)    No. 79-2243

Opinion filed June 2, 1981.

James J. Doherty, Public Defender, of Chicago (James L. Rubens, Assistant Public Defender, of counsel), for appellant.

Richard M. Daley, State's Attorney, of Chicago (Marcia B. Orr, Adrienne Nobel Nacev, and Christine A. Campbell, Assistant State's Attorneys, of counsel), for the People.

Mr. JUSTICE PERLIN delivered the opinion of the court:

Defendant, Sonny Porter, was charged by information with the murder of Rogester Nelson. Following a trial by jury he was found guilty and sentenced to 30 years' imprisonment. We consider the following issues: (1) whether defendant was proved guilty of murder beyond a reasonable doubt; (2) whether the trial court improperly limited defense counsel's cross-examination of a State's witness to show bias, motive or

interest; (3) whether the trial court erred in denying defense counsel's motion to voir dire a State's witness as to his past narcotics addiction; and (4) whether defendant was denied a fair and impartial trial because of alleged improper comments by the prosecutor during closing argument.

The following evidence was adduced at trial:

Twenty-year-old Cheri Parson testified that on March 16, 1979, at approximately 1 a.m. she met defendant, whom she had known for approximately two weeks, in front of the Pacific Garden Mission. Defendant told Ms. Parson that his friend wanted to have sexual intercourse with her. Ms. Parson and defendant proceeded to a "truck-van"[1] owned by Jettime Clemmons located at 17th and Dearborn Streets. A short time thereafter the victim, Rogester Nelson, came to the truck and asked defendant if he could have sex with Ms. Parson. Defendant asked the victim if he "could pay" but Ms. Parson did not hear the victim respond. After defendant left the truck, Ms. Parson had a conversation with the victim, and following their conversation they engaged in sexual relations. Ms. Parson acknowledged that although it is customary for her to be paid prior to performing acts of prostitution, the victim did not pay her prior to their sexual relations. Defendant returned to the truck and asked if the victim had paid Ms. Parson. When the victim replied that he didn't have any money, defendant "reached under the bed and picked up an ax." The victim, whose pants were below his knees, stood up, and defendant struck him in the face with the ax. Ms. Parson, still in bed, covered her face and heard "somebody dragging somebody out of the truck." She then got out of bed, dressed and went to the doorway of the truck. As she stood in the doorway she observed defendant strike the victim twice across the face with the ax. Defendant was not "straddling" the victim. She did not observe defendant strike the victim with a board. Ms. Parson ran from the truck and returned to the Pacific Garden Mission.

Ms. Parson further testified that she did not strike the victim in the face with the ax and that she could not lift the ax. Ms. Parson also testified that her right arm is afflicted with cerebral palsy.

Louis Wright testified that on March 16, 1979, he was living in a truck near 18th and Dearborn Streets. At approximately 2:45 a.m. defendant, whom Wright had known for approximately 10 years, came up to the window of Wright's truck and said, "Hey Louis, loan me your shotgun man." Wright refused to give defendant the gun, and the two men conversed through the truck window for a short time. After their conversation, Wright closed the window and tried to go to sleep but heard "some type of disturbance" emanating from Clemmons' truck approximately 65 to 90 feet away. Wright sat up, "rubbed" the frost from his

---

[1] The witnesses generally refer to this vehicle as a truck. The truck was equipped with a bed, cabinet, stove and toilet facilities.

window and saw defendant "carrying out someone partially nude to one of those junk cars." When asked if the man he saw with defendant was walking, Wright replied: "The person seemed to be weak, I mean it wasn't exactly a walk, it was more a drag, like." Wright testified that he did not see defendant strike the victim.

William Davis testified that on March 16, 1979 at approximately 3 a.m. he was in the vicinity of 1700 South Dearborn Street. He heard no disturbance but observed defendant, whom he had known approximately eight years, "pull" the victim, whose pants were "down to his knees," out of Clemmons' truck. Defendant "threw" the victim on the ground by the truck, "straddled" him, and struck him in the head four or five times with a long object. Davis, who was approximately five feet away from the defendant at this time, "rushed" behind a lamp post. Defendant then went to a nearby automobile and got a blanket. Defendant wrapped the blanket around the victim, "dragged him about two car-lengths to an abandoned automobile and put him in it."

Frank Page, an employee of Al's Auto Yard located at 1711 South Dearborn Street, testified that on March 16, 1979, at approximately 12:30 p.m. he went into the yard to gather some car parts when he observed a "human body just laying there." Although the body was partially covered by a blanket, Page observed that the body was "nude from the waist down." As Page left the yard to telephone the police, he saw a squad car. Page stopped the squad car and reported what he had observed.

Chicago Police Department Investigator Paul Parizanski testified that he was assigned to investigate the homicide of Rogester Nelson. When he arrived at Al's Auto Yard, he observed that the yard was strewn with various auto parts. Amidst the auto parts and "just inside of the fence there was a body of a man," nude from the waist down, which was partially covered with a blanket. Investigator Parizanski found a pair of pants and underpants outside the junk-yard fence, approximately 35 feet from the body. A pair of men's shoes were found at the rear of Clemmons' truck. Inside the truck the investigator found "two small pools of blood" next to the bed and blood "splattered" on the cabinet across from the bed. When asked if he had observed "any drag marks," Investigator Parizanski replied: "The area still had a lot of snow on the ground and just starting to thaw and you really couldn't tell from the ground."

Chicago Police Officer Richard Thoren testified that at approximately 8 p.m. on March 16, 1979, he spoke with Davis. Pursuant to this conversation he proceeded "to look for" defendant and an individual named Sundance Davidson. Upon locating defendant and Davidson, Officer Thoren placed defendant under arrest. After interviewing defendant, Officer Thoren and defendant proceeded to Al's Auto Yard. Pursuant to their conversation Officer Thoren "climbed approximately a

ten-foot fence, * * * got into the junk yard, * * * went to the second row of junked cars, counted five cars down and by a blue auto * * * found an ax."

Dr. Eupil Choi, a pathologist for the Cook County Medical Examiner, performed an autopsy upon the body of the victim and determined the cause of death to be a "blunt head injury." Dr. Choi's examination revealed four major head wounds, the deepest penetrating approximately one inch. Any of the four wounds could have resulted in death. In Dr. Choi's opinion the nature of the wounds was consistent with having been caused by an ax, although Dr. Choi could not determine how the ax had been held or how forcefully the blows had been struck. In addition, Dr. Choi's examination revealed small lacerations on the ribs, three lacerations on the lips, and one laceration on the chin, a fractured jaw bone and "scrapings over the lower left chest cage." In Dr. Choi's opinion it was unlikely that the "scrapings had been caused by an ax." The victim was approximately six feet one inch tall and weighed approximately 155 pounds.

Bernadette Kwak, a microanalyst for the Chicago Police Department, testified that the victim had type B blood and that the blood on the clothing and the ax was also type B.

Dolores Parson, Cheri Parson's aunt, testified on behalf of defendant that Cheri did not enjoy a good reputation in the community for veracity.

Defendant testified that on March 16, 1979 at approximately midnight he, Wright and Davis were "standing by [Clemmons'] truck." When Ms. Parson arrived with the victim, whom defendant had never seen before, she asked the men to leave. The men went to Mr. Wright's truck where they drank a pint of wine and conversed. Approximately 15 minutes later defendant heard "yelling and hollering up there at [Clemmons'] truck." Defendant "asked to borrow [Wright's] shotgun to run the dude off," but Wright refused. As defendant, followed by Wright and Davis, approached Clemmons' truck, he "heard yelling and hollering" and saw the victim "backing out of the truck." Defendant observed Ms. Parson "punching [the victim] in the head with the ax." Ms. Parson then threw the ax to the ground and the victim tried "to pick up the ax but he was having a hard time moving because his pants was down below the knees." As defendant approached them, Wright said, "Stop him, Sonny, hit him." Because defendant thought the victim was going to hit him with the ax, he "picked up a board and jabbed [the victim] in the side." The victim fell to the ground. Defendant and Wright carried the victim to an abandoned automobile and covered him with a blanket. Defendant "took the ax and throwed it over to the junk yard."

Defendant further testified that he had never taken money from Ms. Parson and that he had not struck the victim with an ax. Defendant is

approximately five feet eight inches tall and weighs approximately 185 pounds.

The State called Chicago Police Department Homicide Investigator David Oravetz as a rebuttal witness. Investigator Oravetz testified that he interviewed defendant at approximately 11 p.m. on March 16, 1979. During the interview defendant told the investigator that he had "struck Rogester Nelson once in the stomach with the ax."

I

Defendant initially contends that the "numerous inconsistencies" in the testimony of the prosecution witnesses create a reasonable doubt of defendant's guilt. The weight and credibility to be afforded a witness' testimony is a determination for the jury as the trier of fact, and unless that determination is so unreasonable, improbable or unsatisfactory as to raise a reasonable doubt of defendant's guilt, the verdict will not be disturbed on appeal. (*People v. Donald* (1963), 29 Ill. 2d 283, 287, 194 N.E.2d 227.) Proof of guilt beyond a reasonable doubt does not require proof beyond any possibility of a doubt. (*People v. Williams* (1977), 66 Ill. 2d 478, 485, 363 N.E.2d 801.) It is not necessary that the jury disregard the inferences which naturally flow from the evidence, nor is the trier of fact required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt. (*People v. Benedik* (1974), 56 Ill. 2d 306, 309, 307 N.E.2d 382.) Rather, a trier of fact may use common sense and general knowledge in considering evidence and drawing the proper inference from it. (*People v. Toliver* (1978), 60 Ill. App. 3d 650, 652, 377 N.E.2d 207.) The jury need not be satisfied beyond a reasonable doubt as to each link in the chain of circumstances relied upon to establish guilt, but it is sufficient if all the evidence, taken together, satisfies the jury beyond a reasonable doubt of the accused's guilt. *Williams*, 66 Ill. 2d 478, 485.

In support of his contention that he was not proved guilty beyond a reasonable doubt, defendant argues that "[i]t is absurd to find that a man standing 5'8" and weighing 185 pounds swinging a heavy axe over his shoulder and striking another man's head 4 or 5 times would create penetrating wounds of 1 inch or less. It would be reasonable to assume that a man of that size and weight swinging a heavy axe would have caused considerably more damage than 1 inch wounds and lacerations of the lips and chin."[2] Dr. Choi, the pathologist, testified that he could not determine from his examination how the ax had been held or how

---

[2] Defendant further argues that "[g]iven the relative size and strength of Sonny Porter and Cheri Parson it was consistent with medical testimony that Cheri inflicted these lacerations, not Sonny." We note that the record is devoid of any indication of Ms. Parson's size.

forcefully the blows had been struck. Yet defendant, in his own words, would have us "assume," or engage in conjecture without the benefit of any evidence, that greater wounds would have resulted had he wielded the ax and elevate that assumption to a reasonable doubt. As we previously noted, the trier of fact is not required to search out a series of potential explanations compatible with innocence and elevate them to the status of a reasonable doubt. *People v. Benedik*, 56 Ill. 2d 306, 309.

■■ Defendant also argues that inconsistencies between Davis' testimony and Wright's testimony, as well as inconsistencies within Davis' testimony, cast grave doubt upon Davis' observational abilities. We have carefully reviewed the record and are of the opinion that the alleged inconsistencies do not exist or amount to only minor discrepancies. In such a case a reasonable doubt of guilt is not created and defendant's conviction should not be disturbed. (*People v. Cepolski* (1979), 79 Ill. App. 3d 230, 237, 398 N.E.2d 351; *People v. Heidelberg* (1975), 33 Ill. App. 3d 574, 598, 338 N.E.2d 56.) Without reiterating the testimony, we cannot conclude that the testimony was so replete with inconsistencies and improbabilities that defendant's guilt was not established beyond a reasonable doubt.

## II

Defendant also contends that the trial court erred in restricting cross-examination of the State's witness, William Davis, as to a "1979 bond forfeiture [warrant] on a theft charge." Outside the presence of the jury defense counsel made a motion to cross-examine Davis concerning the bond forfeiture warrant. Defense counsel was attempting to show that Davis' testimony might be influenced by interest, bias or motive to testify falsely. The prosecutor, without explanation, denied that there was an outstanding warrant. The trial court ruled that:

> "* * * insofar as before you go into the question that there is an outstanding warrant against this particular witness you will first ask him if there has been any agreement by the State because there would be no need if there is no agreement by the State or anything to go into something that would have no basis or any relevancy whatsoever, the fact that there is a bond forfeiture."

■■ In *People v. Eddington* (1979), 77 Ill. 2d 41, 46, 394 N.E.2d 1185, *cert. denied* (1980), 445 U.S. 944, 63 L. Ed. 2d 777, 100 S. Ct. 1340, our supreme court reiterated the rule it enunciated in *People v. Mason* (1963), 28 Ill. 2d 396, 400-01, 192 N.E.2d 835, and has consistently followed (see *People v. Barr* (1972), 51 Ill. 2d 50, 280 N.E.2d 708; *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852; *People v. Galloway* (1974), 59 Ill. 2d 158, 319 N.E.2d 498):

" '[S]howing interest or bias on the part of a witness is also an accepted method of impeachment, and even in jurisdictions where evidence of arrest or indictment is not ordinarily admissible to impeach credibility generally, the fact that a witness has been arrested or charged with a crime may be shown or inquired into where it would reasonably tend to show that his testimony might be influenced by interest, bias or a motive to testify falsely.' "

The court in *Eddington* at page 46 further explained:

"In situations involving assessment of credibility, the jury should have a right to consider the pending charges, and, of course, the prosecution should have the right to show that no leniency was offered and that none was expected. The jury would then be able to consider any subliminal influences that could be exerted by the particular situation."

Defendant's inquiry into the existence of a bond forfeiture warrant is permissible when its purpose is to show bias, motive, or interest, and thus the trial court's ruling was improper. Nonetheless, as we indicated in *People v. Boyce* (1977), 51 Ill. App. 3d 549, 556, 366 N.E.2d 914, and reiterated in *People v. Bingham* (1979), 75 Ill. App. 3d 418, 425, 426, 394 N.E.2d 430:

" 'Improper limitation of cross-examination by the defendant warrants reversal only where there has been a clear abuse of discretion and a showing of manifest prejudice to the defendant. (Citations.) Such is the case where the defendant is denied reasonable access to an appropriate area of cross-examination of a witness whose testimony is crucial to the prosecution, or upon whose credibility the prosecution must stand or fall. (Citations.) However, any error in restricting the cross-examination of a witness whose testimony serves merely to buttress the prosecution, or on whose credibility alone the prosecution does not rest, must be deemed harmless.' "

(See also *People v. Cepolski* (1979), 79 Ill. App. 3d 230, 308 N.E.2d 351.) The prosecution did not rest upon Davis' credibility alone. The State offered the testimony of both Parson and Wright. Under these circumstances, a reversal is not warranted due to the improper restriction of defendant's inquiry.

III

Defendant also contends that the trial court erred in denying defense counsel's motion to voir dire William Davis outside the presence of the jury concerning "his past narcotic addiction, its effect on him at the time of trial, and whether in fact he was a narcotic addict or user at the time of

the offense and at the time of trial." Defense counsel stated that this voir dire was necessary to ascertain Davis' fitness, competence and perception. The defense attorney referred to Davis' arrest report which indicated two narcotics related charges in 1957 and a 1963 charge which indicated narcotics addiction. The court denied defendant's motion. During cross-examination defense counsel asked Davis if he had taken narcotics on the night of the murder or prior to trial.

■■ Initially we note that defendant was not denied his right to cross-examine Davis concerning his use of or addiction to narcotics. Defendant was only denied the opportunity to question Davis outside the presence of the jury. Thus, *People v. Strother* (1972), 53 Ill. 2d 95, 290 N.E.2d 201, the case relied upon by defendant, is inapplicable to the case at bar. It is well settled that drug addiction goes only to the credibility of the witness and does not render him incompetent to testify. (*People v. Dixon* (1961), 22 Ill. 2d 513, 177 N.E.2d 224.) Accordingly, we cannot conclude that the trial judge erred in denying defense counsel's motion to voir dire Davis to ascertain Davis' competency.

## IV

■■ Defendant finally contends that the comments of the prosecutor during closing argument were improper and deprived him of a fair and impartial trial. In closing argument the prosecutor argued:

"Our laws protect everybody, even the so-called people like Rogester Nelson and some of the persons you have seen in this court room over the last week because that is what our system is about. I don't care what Rogester Nelson was doing that night and I don't care what he was. He did not deserve to have his head pulverized by this ax because he wouldn't pay his prostitute's pimp.

[Defense Counsel]: Objection, Judge, there is no testimony about a pimp.

The Court: The objection is overruled.

❋ ❋ ❋

Ladies and gentlemen of the jury, our evidence showed, in common language, that the defendant is a pimp, he is the one that gets the prostitute, collects the money and makes sure he doesn't get hurt.

[Defense Counsel]: Objection.

The Court: Objection overruled.

❋ ❋ ❋

I'm still asking why he [defendant] would ever have the nerve, propensity of the criminal mind, to kill Rochester Nelson; because

he is a pimp and didn't get his money and that is the real question why, and that is the why in every case.

          ❖ ❖ ❖

Think about it. Think about what happened and what you are saying if you say that. You are saying, number one, the State's case is true; you are saying, number two, that when a pimp, not getting paid, when an act of prostitution is engaged in allows any citizen who is in the same position to ahead and axe somebody to death."

Defendant argues that the State had the opportunity but failed to ask Ms. Parson on direct examination whether defendant acted as her pimp, and therefore there was no evidence to support the State's characterization of defendant as a pimp. We note that although defendant argues that he was not Ms. Parson's pimp, he did not avail himself of the opportunity to question her during cross-examination as to whether he had acted as her pimp. Ms. Parson admitted that she was a prostitute and testified that defendant had informed her that a friend of his wanted to have sex with her. Ms. Parson further testified that the victim asked defendant's permission to have sexual relations with her, and that defendant had made repeated demands for payment. As such the argument was based upon the natural inferences from the evidence. *People v. Weatherspoon* (1978), 63 Ill. App. 3d 315, 379 N.E.2d 847.

■■ Defendant also complains that the following comment constitutes reversible error:

"Ladies and gentlemen of the jury, Sonny Porter wields his power, he wielded his power around the 17th Street and Dearborn Avenue area, an area that is probably not the best in the world with the kind of people where Sonny Porter can be the head of his gang.

[Defense Counsel]: Objection.

The Court: Objection overruled, this is argument.

[Defense Counsel]: There is no such evidence.

The Court: Objection overruled."

Defendant argues that there was no evidence that he was the head of a gang. The State responds that the prosecutor only said that defendant *could* be the head of a gang. In *People v. McLean* (1971), 2 Ill. App. 3d 307, 276 N.E.2d 72, defendant was referred to as a "gang chief" although there was no evidence to support that statement. Defendant's conviction was reversed based upon the cumulative effect of several errors. It is our opinion that in the case at bar the defendant was not substantially prejudiced by the remark, and we cannot conclude that the jury's verdict would have been any different had the remark not been made. We do not mean to condone this type of performance by members of the bar. Counsel for the prosecution and for the defense should always remain

aware of their duty to the court and to each other to abstain from unfair and improper argument.

Defendant further argues, relying upon *People v. Rothe* (1934), 358 Ill. 52, 192 N.E. 777, that the following comment was prejudicial because it was not based upon the evidence:

> "Because you look at the scene of the crime and all around and say why would he dump him? Yes. the defense is right, there are no explanations, he doesn't tell and I don't tell, defense counsel don't [*sic*] tell. I don't think any of us could ever say why Sonny Porter dumped him in that lot.
>
> [Defense Counsel]: Objection.
>
> [Assistant State's Attorney]: You heard from—
>
> [Defense Counsel]: No such evidence.
>
> The Court: Objection overruled."

In *People v. Rothe*, a prosecution for armed robbery, the defendants testified that the money taken by them was for the sale of cigarettes to the victim in behalf of a man named Frank Rossi. During closing argument the prosecutor stated that "they had searched for Rossi and that he could not be found because there was no Rossi." The court held at page 56 that it was improper for a prosecutor "to get before the jury that which amounts to his own testimony." Based upon the cumulative effect of many prejudicial errors, the court reversed defendants' convictions. In the case at bar, it is our opinion that defendant was not so prejudiced.

■■ During closing argument the prosecutor also stated:

> "So what do we have in this case? What we have is the defense counsel starting out telling you: Ladies and gentlemen, we don't have to prove a thing, just remember we don't have to do a thing. Hedging a bit.
>
> [Defense Attorney]: Objection.
>
> [Assistant State's Attorney]: But he did choose to do a thing—
>
> The Court: Objection overruled.
>
> [Assistant State's Attorney]: He chose to put on an entire defense, and ladies and gentlemen of the jury, I believe that you will be receiving an instruction that says, No, the defense doesn't have to prove his innocence, but the defendant's testimony has to be judged in the same way as any other witness * * *."

Defendant argues that this statement by the prosecutor "was a blatant attempt to shift the burden of proof from the State to the defendant." In support of his argument defendant relies upon *People v. Hanson* (1977), 44 Ill. App. 3d 977, 359 N.E.2d 188, for the proposition that it would be improper for the prosecution to state or imply that the defendant had the burden of introducing evidence to create a reasonable doubt of guilt. We have no dispute with this proposition. However, in the case at bar the

statement made by the prosecutor, taken in context, cannot, in our opinion, be construed as either a statement or implication that the defendant had the burden of introducing evidence to create a reasonable doubt of guilt.

Based upon the foregoing we affirm the judgment of the circuit court of Cook County.

Affirmed.

HARTMAN, P. J., and STAMOS, J., concur.