THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
THOMAS YANCEY, Defendant-Appellant.

First District (1st Division)   No. 76-780

Opinion filed January 30, 1978.

James J. Doherty, Public Defender, of Chicago (Matthew J. Beemsterboer, Assistant Public Defender, of counsel), for appellant.

Bernard Carey, State's Attorney, of Chicago (Lee T. Hettinger and Mary Ann Callum, Assistant State's Attorneys, of counsel), for the People.

Mr. PRESIDING JUSTICE GOLDBERG delivered the opinion of the court:

Thomas Yancey (defendant) was tried jointly before a jury with Nathaniel Brown, Jr. (codefendant). Both were found guilty of murder. Defendant was sentenced to 75 to 90 years. He appeals. The judgment and sentence of codefendant were affirmed after a separate appeal to this court. (*People v. Brown* (1977), 55 Ill. App. 3d 569, 371 N.E.2d 140.) The sole contention raised by the codefendant on appeal was directed to severity of the sentence.

The defendant presents four issues for review: proof of guilt beyond a reasonable doubt; prejudicial trial error when his attorney was cited for contempt in the presence of the jury; denial of his sixth amendment right to confrontation and prejudicial closing argument by the prosecutor.

The body of William Wilkerson, 15 years old, was discovered on October 13, 1974, in the bottom of an elevator shaft in a Chicago apartment building. The details surrounding his death were provided principally by two accomplice witnesses for the State, Andrew Dickens and Demetrius Parks.

Andrew Dickens, 17 years old at the time of the trial, testified that he was then confined at St. Charles, Illinois, for escaping from the Illinois Youth Center at Hanna City, Illinois, where he had been confined for armed robbery. He was scheduled for a parole hearing on the day following his testimony. He testified he and Parks encountered the codefendant as they walked down the hall on the 11th floor of the building. They were beckoned into the laundry room on that floor. There they saw the codefendant, who was holding a .25-caliber automatic pistol in a .32-caliber frame, the defendant and the victim, who was still alive. The codefendant said he had shot the victim and was planning to kill him, and instructed the crying and shaking victim to show them a bullet wound in his chest. The codefendant told Dickens and Parks to tie up the victim.

Parks tied the victim's hands with the cord from an electric iron. The witness stated he and Parks were then instructed to stop the elevator between the 11th and 12th floors. The defendants dragged the struggling victim to the open elevator door, and, after unsuccessfully attempting to push him down the open elevator shaft, returned to the laundry room. The witness stated he remained in the hall, but, according to details provided by the codefendant, later learned the defendants attempted to strangle the victim with a stocking and broke a broom handle over the boy's neck. The codefendant finally shot the victim in the left temple. The witness observed the defendants throw the body down the elevator shaft and stated he heard a noise each time the body hit a floor.

On cross-examination Dickens explained he stopped the elevator between floors by pushing in the red stop button on the inside of the car. He had spoken with the defendant's attorney, assistant public defender William Murphy, on May 14, 1975, stating at that time the defendant was not involved in the murder. However, he testified that the defendant "was there." The witness further testified he had written a letter to the defendant in which he stated that the defendant was not involved in the murder and he had so informed defendant's lawyer. However, the police made him implicate defendant. He wrote this letter in the presence of Sherry Heard, defendant's girlfriend. He included the words "Black P. Stone" in his signature on the letter. He denied being a member of this organization.

Demetrius Parks, 16 years old at the time of the trial, stated he was present in the laundry room when the defendants attempted to strangle the victim. He saw the defendant start choking the victim and saw both defendants break the broom handle over the victim's neck. After viewing a photograph of the body, the witness stated that the necktie appearing in the victim's mouth had been placed there by the defendant. On cross-examination the witness stated he had been sent to Hanna City for burglary and that a warrant had been issued for his arrest at the time of the murder because he failed to return to Hanna City after his furlough expired. He stated he was brought to the courtroom that day from the Audy Home where he was confined for not returning to Hanna City. He telephoned Mr. William Murphy from Sherry Heard's home on April 23, 1975, but denied stating in that conversation that he wished to tell the court the defendant was not involved in the murder.

The State also called John Markham, an investigator for the Chicago Police Department, and Harry Wilson, an assistant State's Attorney. Both witnesses testified that on October 14, 1974, the defendant orally admitted he took the victim to the 11th floor of the building and threw him down the elevator shaft. Markham stated that on October 14, 1974, the

codefendant admitted he shot the victim. The defendants refused to give written statements. Markham also found a .32-caliber bullet casing when he investigated the 11th floor laundry room.

Two witnesses described the condition of the victim's body when it was found on October 13, 1974. Dr. Culala, the pathologist, found two gunshot wounds in the left front chest wall and one gunshot wound in the left temple. The latter was the cause of death. There were abrasions on the knees consistent with the body being dragged. There were no protruding bones and no apparent trauma to the internal organs or neck area. The witness did not X-ray the body. He stated that generally, but not always, he would expect multiple fractures resulting from a fall from a great height. His pathological examination was not "a very accurate way of assessing fractures or any trauma to the body."

Andrew Brooks, an employee of the City Crime Laboratory, who photographed the body while it lay at the bottom of the elevator shaft, testified that, in his opinion, the victim's left arm was broken. On cross-examination, Brooks stated he always has been correct in the 10 to 15 times he has decided there was a fractured arm or shoulder. He also stated the victim was found with a cord around his neck and a sock in his mouth.

Robert Williams, an elevator repairman, found the elevator stuck between the 11th and 12th floors. In his opinion, the only method of depositing the body at the bottom of the elevator shaft was by pushing it through an open door on one of the floors. He observed that the red stop buttons on the exterior roof of the elevator were pushed in and the tape switches dislodged. He noted that these buttons can be pushed from inside the elevator and that jumping inside the elevator could dislodge the tape switches.

The defense called George Brobst, an investigator for the public defender. He testified that on May 14, 1975, he recorded a conversation between Dickens and attorney William Murphy. He stated that Sherry Heard, was also present during this conversation. The witness did not hear Sherry Heard threaten or intimidate Dickens in any manner.

Charles Murphy, also an assistant public defender, testified that on April 23, 1975, he heard Parks state on the telephone the defendant was not present the day of the shooting. Attorney William Murphy also testified Parks telephoned him on April 23, 1975, and denied that defendant had any involvement in the murder. William and Charles Murphy are brothers. William Murphy was trial attorney representing the defendant. The defense also called Sherry Heard, who testified she was present when Dickens wrote the letter to defendant on May 14, 1975. She did not threaten Dickens or Parks.

■■ Defendant initially contends he was not proved guilty beyond a reasonable doubt for a number of reasons. Turning first to the accomplice testimony, Illinois follows "the rule that uncorroborated accomplice testimony is a sufficient ground on which the trier may base a conviction * * *." The issue of "whether accomplice testimony, corroborated or uncorroborated, is a satisfactory basis for conviction goes to the weight of the evidence and is, therefore, in the province of the jury or the court." (*People v. Wilson* (1977), 66 Ill. 2d 346, 349, 362 N.E.2d 291.) In the record before us, the detailed testimony of Dickens and Parks was corroborated by physical facts including the finding of the body at the bottom of the elevator shaft, the elevator stopped between the 11th and 12th floors, the .32-caliber bullet casing in the laundry room, the gunshot wounds in the victim's left chest wall and left temple, and the electrical cord and cloth gag on the victim's neck and in his mouth. The testimony of the accomplices was further corroborated by the statements defendants themselves made on October 14, 1974, wherein they admitted bringing the victim to the 11th floor laundry room, shooting him and throwing the body down the elevator shaft.

■■ The claimed discrepancies between the testimony of the accomplices and their prior out-of-court statements were all fully explored at trial. The credibility of these witnesses was a question for the jury, who were in a superior position to observe and weigh their testimony. (*People v. Inman* (1976), 38 Ill. App. 3d 752, 756, 348 N.E.2d 510.) Although Dickens and Parks acknowledged their conversation with William Murphy at a prior date, and Dickens testified he wrote the defendant the letter containing the exculpatory statements, both witnesses maintained at trial that the defendant was an active participant in commission of the crime. In addition, the State urges that the prior out-of-court statements were the result of coercion by Sherry Heard. She testified she did not intimidate the witnesses. It was the function of the jury as the trier of fact to weigh the effect of these and other factors upon the credibility of the witnesses.

■■ ■ Defendant next contends that the testimony of the elevator repairman and the pathologist contradicted the testimony of the accomplices in that the repairman stated the red stop buttons on the outside of the elevator roof are normally turned off from outside the elevator and the pathologist stated he generally finds multiple fractures when a body falls from a great height. On the same principle enunciated above, in our opinion it was a matter for the jury to assess these claimed inconsistencies, with due regard for the fact that both witnesses qualified their generalizations. The repairman testified that jumping on the inside of the elevator could dislodge the tape switches and the red stop buttons

could be operated from inside the elevator. The pathologist stated that generally, but not always, multiple fractures resulted from a fall from a great height.

■■ The defendant next urges reversible error when the court permitted the laboratory technician, Andrew Brooks, to testify that the victim's left arm was broken. This testimony was given in response to a question as to whether the witness noted from the body at the scene, "any sort of severe damage to the body that would be known to a layman." Although the witness admittedly was not a physician, he explained on cross-examination that his past experience always proved he was correct in deciding whether an arm or a shoulder was broken. The qualifications required to permit a witness to testify as an expert lie within the sound discretion of the trial court (*Hardware State Bank v. Cotner* (1973), 55 Ill. 2d 240, 250, 302 N.E.2d 257) and reversal is not warranted absent manifest abuse of this discretion (*Galluccio v. Hertz Corp.* (1971), 1 Ill. App. 3d 272, 280, 274 N.E.2d 178, *appeal denied* (1972), 49 Ill. 2d 575). The only point raised by defendant here is that the testimony necessarily should have been given by an expert. In this situation the extent of the qualifications of the witness to respond to the question did not affect his competency but would go only to the weight of his testimony. In our opinion, upon due consideration of the question and answer, no error resulted from this testimony.

■■ Defendant contends that the accomplice testimony was influenced by promises of leniency as evidenced by the fact that both Parks and Dickens were incarcerated at the time of the trial pending the resolution of other proceedings. Undoubtedly promises of leniency require that accomplice testimony be regarded and considered with skepticism. (*People v. Wilson* (1977), 66 Ill. 2d 346, 350, 362 N.E.2d 291.) However, a conviction may stand, even if an accomplice witness admits to promises of leniency, if the testimony is of such character as to convince a jury of guilt beyond a reasonable doubt. (*People v. Nastasio* (1963), 30 Ill. 2d 51, 55, 195 N.E.2d 144, *cert. denied* (1964), 377 U.S. 911, 12 L. Ed. 2d 181, 84 S. Ct. 1173.) In the instant case, the promises of leniency are inferred from the record and denied by the accomplices. The extensive corroboration provided by physical evidence and by the other witnesses for the State strongly supports the statements of Parks and Dickens. We cannot say that the evidence before us, viewed in its entirety, "is so improbable as to justify a reasonable doubt of the accused's guilt." *People v. Owens* (1976), 65 Ill. 2d 83, 90, 357 N.E.2d 465, *cert. denied* (1977), 430 U.S. 955, 51 L. Ed. 2d 562, 97 S. Ct. 1143.

■■ Defendant next contends that the hostile conduct of the trial judge toward defendant's trial attorney, William Murphy, was so prejudicial as to require reversal. During cross-examination of Investigator Markham,

the court sustained a series of objections when William Murphy repeatedly asked Markham if he had spoken with Dickens and Parks. When William Murphy remarked to the court, "I thought this was a search for the truth", the court responded, "Mr. Murphy, I hold you in direct contempt of court. I told you five times and I'm fining you $100. Proceed." Defendant claims this interchange prejudiced the jury against him. However, the authorities cited in defendant's brief are not persuasive. The remarks of the court evaluated in all of them were of a far more serious nature. In these cases, the court directly disparaged the presentation by defense counsel (*People v. Thomas* (1958), 15 Ill. 2d 344, 348-49, 155 N.E.2d 16, *cert. denied* (1959), 359 U.S. 1005, 3 L. Ed. 2d 1034, 79 S. Ct. 1146, and *People v. Coli* (1954), 2 Ill. 2d 186, 189, 117 N.E.2d 777); expressed doubt as to the veracity of a witness (*People v. Marino* (1953), 414 Ill. 445, 451, 111 N.E.2d 534); or repeatedly interrupted and commented upon defense counsel's argument (*People v. Riggins* (1956), 8 Ill. 2d 78, 85, 132 N.E.2d 519). In the case before us, the provocative remark of able counsel to the court, undoubtedly made in the heat of trial, would be less subject to criticism if made outside the presence of the jury. The entire colloquy was quite brief and constituted one small and, to our opinion, insignificant incident in an otherwise well conducted trial.

■■ Defendant claims that his sixth amendment right to confrontation was violated when the court refused to permit defense counsel to question the accomplices regarding their prior criminal records, arrests and convictions and to introduce their juvenile court records. The Juvenile Court Act limits the use of juvenile police records as follows (Ill. Rev. Stat. 1973, ch. 37, par. 702—8(3)):

> "The records of law enforcement officers concerning all minors under 17 years of age must be maintained separate from the records of arrests and may not be open to public inspection or their contents disclosed to the public except by order of the court or when the institution of criminal proceedings has been permitted under Section 2—7 or such a person has been convicted of a crime and is the subject of pre-sentence investigation or proceedings on an application for probation."

This limitation does not preclude access to the juvenile records for impeaching the credibility of a juvenile witness by showing "a possible motive for testifying falsely." (*People v. Norwood* (1973), 54 Ill. 2d 253, 257, 296 N.E.2d 852.) However, Dickens and Parks testified, both on direct and cross-examination, regarding their incarceration at the time of trial for armed robbery and burglary, respectively.

■■ In addition, the defendant had ample opportunity to establish the "possible motive" of these accomplice witnesses "for testifying falsely" in exchange for future leniency. The record shows that defense counsel also

264

wished to bring before the jury past unrelated instances of misconduct by these witnesses as "prior bad acts" for the obvious purpose of showing "bad character" of the witnesses. (See *Norwood*, 54 Ill. 2d 253, 257.) In our opinion this procedure is expressly condemned by *Norwood* which construes the pertinent statute as not prohibiting disclosure of juvenile records "insofar as they might be relevant to the defendant's claim that the witness's testimony was attributable to lenient treatment which he had received or had been promised." *Norwood*, 54 Ill. 2d 253, 258.

■■ Defendant urges that the trial court prevented proper cross-examination of Investigator John Markham and assistant State's Attorney Harry Wilson. The testimony of these witnesses on direct examination was limited to conversations with defendants on October 14, 1974. On cross-examination the trial court sustained objections to questions on entirely unrelated matters. "The latitude to be allowed in the cross-examination of a witness rests largely in the discretion of the trial court, and it is only in a case of an abuse of such discretion resulting in prejudice to a defendant that a reviewing court will interfere." (*People v. Bridgeforth* (1972), 51 Ill. 2d 52, 65, 281 N.E.2d 617, *appeal dismissed* (1972), 409 U.S. 811, 34 L. Ed. 2d 66, 93 S. Ct. 100.) We find neither an abuse of discretion nor prejudice to defendant in this regard.

■■ Finally, defendant asserts that the prosecutor inflamed the prejudices of the jury by commenting in closing argument that Dickens perhaps is associated with the organization known as the Black P. Stone Nation or was motivated by fear of this organization to write the exculpatory letter to defendant. These comments were permissible inferences based upon the evidence. Dickens testified that he signed the letter "Black P. Stone." On cross-examination, he was questioned by William Murphy regarding the possibility of association with the organization. See *People v. Hairston* (1970), 46 Ill. 2d 348, 375, 263 N.E.2d 840, *cert. denied* (1971), 402 U.S. 972, 29 L. Ed. 2d 136, 91 S. Ct. 1658.

■■ Defendant also claims reversible error when the prosecutor noted in closing argument, "* * * the testimony which you heard from the witness stand is unrebutted and uncontradicted." Commenting upon the uncontradicted nature of testimony is considered a permissible summary of the evidence. *People v. Hopkins* (1972), 52 Ill. 2d 1, 6, 284 N.E.2d 283; *People v. Summers* (1977), 49 Ill. App. 3d 70, 77-78, 362 N.E.2d 1347.

For these reasons, we affirm the judgment appealed from.

Judgment affirmed.

McGLOON and O'CONNOR, JJ., concur.