THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
ORRIS BALLARD *et al.*, Defendants-Appellants.

Second District   No. 76-565

Opinion filed October 20, 1978.

Spiezer & Thorsen, of Rockford, and George C. Pontikes, of Foss, Schuman & Drake, of Chicago, for appellants.

William J. Scott, Attorney General, of Chicago (Steven Rosenberg, Stuart W. Opdycke, Donald B. Mackay, and Melbourne A. Noel, Jr., Assistant Attorneys General, of counsel), for the People.

Mr. JUSTICE WOODWARD delivered the opinion of the court:

Defendants, Orris Ballard, Lawrence (Larry) Ballard, Serge Gaudry and Donald Russell were indicted and charged with 15 counts of theft by deception (Ill. Rev. Stat. 1971, ch. 38, par. 16—1). Following jury trial, defendants Orris and Larry Ballard and Gaudry were found guilty on 12 counts and were each sentenced to two to eight years imprisonment. Defendant Russell was found guilty on four counts; he is not a party to this appeal. Defendants Orris and Larry Ballard and Gaudry appeal from the jury's verdict and the sentences imposed by the trial court.

The charges arose from an alleged fraudulent scheme involving the sale of distributorships by defendants to purchasers, referred to as investors. At trial 13 witnesses testified that each had purchased a distributorship from a company named American International Tool Company (hereafter AITC). After seeing a newspaper advertisement, the witnesses met with either Larry Ballard or Donald Russell, who sold the distributorships. Serge Gaudry was president of AITC and Orris Ballard acted as consultant and participated in one or two of the sales. The distributorships were sold for amounts varying between $3000 and $8500. The witnesses signed written contracts which promised that the marketing department of AITC would obtain locations for the placement of the tools, generally 20-40 accounts or locations. Other written and oral promises were made as follows: (1) Large profits could be made because there was a one-third markup for the retail store and one-third markup for the investor; (2) the company would furnish locators, who would set up accounts and locations to place the tools and other merchandise in high

volume retail outlets; (3) the tools and other merchandise would be of the same high quality which the salesmen demonstrated to the investor; (4) a refund of the investment would be paid within one year after the contract if either party desired to cancel, subject to certain adjustments for inventory outstanding.

According to the witnesses, however, once the money was paid to defendants, they received small amounts of merchandise, often of poorer quality than had been represented; that while the accounts and locations were set up, the tools and other merchandise did not sell and the locations were not of the quality represented. The witnesses' complaints went unsatisfied. While one witness did report that her distributorship made some profit for a time, the other 12 testified that they made no money from the investment, and none of them received a refund when requested from defendants. Ultimately they were notified by letter that AITC had gone out of business.

Serge Gaudry, testifying for the defense, explained the theory of the business as follows:

"* * * Well, it seemed to me if I was going to have a successful business, that I had to have some kind of an incentive for my distributors to go out there and perform. So, I thought if I would take a deposit from them of $4,000.00, $5,000.00, $8,000.00, and told them that I would give that deposit back to them at a rate of 10% on their reorders, that gave me two things. First of all, they would keep buying from me. If I was holding that money the only way they would get it back by buying products from me. They would always come back and that's where once I set them up in business they could go and find their own source of things and in that way they always would come back to me and that gave them incentive to go out and promote their sales,

* * *

Well, what I intended to do was build a network of successful distributors, maybe build it up to a hundred, two hundred distributors; with that many that would give me a volume of business big enough that I could pay at a cheap enough price. I would also realize a nice profit on reorders; my people, distributors would realize a nice profit and I could make a living and that's what I had in mind."

According to Gaudry, the company's ultimate failure was due to his lack of business experience; that the business was under capitalized; there was not sufficient reorder to pay refunds as the demands came in; finally, the product simply did not sell.

The first issue on appeal is whether the indictment was valid. Defendants contend that the failure of the indictment to set forth the acts

of deception rendered it fatally defective. The indictment reads as follows:

> "That on or about the 27th day of December, 1972, in the County of Winnebago and State of Illinois, ORRIS BALLARD, LAWRENCE BALLARD, SERGE GAUDRY, DONALD RUSSELL committed the offense of theft, in that they knowingly obtained by deception, control over property of the owner, to wit: an amount of money exceeding $150. belonging to Max Boynton, with the intent to deprive Max Boynton, permanently of the use and benefit of the property, in violation of Paragraph 16—1, Chapter 38, Illinois Revised Statutes, (1971) as amended."

Each of the 14 succeeding counts alleged theft by deception in the same manner as alleged in the count above, except as to the date of the offense and the owner of the property.

■■ The purpose of an indictment is to appraise a defendant of the exact crime with which he is charged so that he may prepare his defense, and may plead the judgment in bar of a subsequent prosecution for the same offense. (*People v. Smalley* (1973), 10 Ill. App. 3d 416, 294 N.E.2d 305.) It is well established that an indictment phrased in the language of the statute creating the crime is sufficiently certain where the words of the statute so particularize the offense by their use alone as to notify the accused of the precise offense charged against him. But where the statute does not specifically define the crime or does so only in general terms, some act showing an alleged violation of the statute must be averred. *People v. Grieco* (1970), 44 Ill. 2d 407, 409-10, 255 N.E.2d 897, 899.

In *People v. Grieco*, defendant was charged with battery in an indictment which read as follows:

> "* * * Joseph Grieco * * *, committed the offense of battery, in that they, intentionally and knowingly, without legal justification, committed a battery on George Quarnstrom which caused great bodily harm to said George Quarnstrom, in violation of ch. 38, §12—3, of the Ill. Rev. Stats., 1963, * * *." (44 Ill. 2d 407, 408.)

In holding that the indictment there met the test for certainty our supreme court pointed out that the term "battery" was one of common usage and understanding, and while the indictment was phrased in the language of the statute, the statute itself set forth all elements necessary to constitute the offense intended to be punished. Coupled with the allegations setting forth the name of the person upon whom the battery was committed and the date it occurred, the indictment was sufficiently certain to enable defendant to prepare a defense and to permit any judgment entered to be pleaded in bar of a subsequent indictment for the same offense.

Applying this reasoning to the case before us, the indictment here is phrased in the language of the statute which sets forth all the elements necessary to constitute the offense intended to be punished. The word "theft" is a word commonly understood; moreover, the indictment particularizes the charge as theft by deception. The indictment also sets forth the names of the persons whose property was taken as well as the approximate date when the thefts occurred. Moreover, a motion for a bill of particulars was available to defendants; while defendant Russell's motion for such a bill was denied, no request for one by the remaining defendants, represented by other counsel, was ever made. As a practical matter, the record demonstrates no difficulty in preparing and presenting a defense and clearly the indictment is sufficient to support a plea of double jeopardy should the need arise. *People v. Grieco.*

We have examined the cases relied on by defendants on this issue, principally *People v. Leach* (1972), 3 Ill. App. 3d 389, 279 N.E.2d 450; *People v. Aud* (1971), 1 Ill. App. 3d 867, 276 N.E.2d 97; and *State v. Kesterson* (Mo. 1966), 403 S.W.2d 606. However, in those cases the court found that indictments phrased in the language of the statute were not sufficient where the indictment did not give a defendant notice of the crime with which she was charged (*Leach*); where the statute itself did not set forth all the elements of the offense and there were no other allegations in the indictments from which defendants could definitely ascertain what acts they were charged with (*Aud*); and where it would not be sufficient to bar further prosecution for the same offense (Kesterson).

■■ It is the policy of our modern courts to disregard mere technical objections and require only that the indictment state the essential elements of the offense; whether an indictment sufficiently charges an offense does not depend on nice attention to technicalities of pleadings or formalistic recital of allegations. (*People v. DePratto* (1976), 36 Ill. App. 3d 338, 343 N.E.2d 628.) As the indictment in the case before us fulfills the requirements outlined above, we hold that the failure of the indictment to specifically allege the various acts of deceptions does not render it invalid.

Next, defendants contend that the State failed to prove them guilty beyond a reasonable doubt. As outlined above, 13 complaining witnesses testified as to the promises both oral and written made to them by defendants and the failure of the defendants to fulfill those promises, particularly the failure to provide refunds of the investment. On the other hand defendants contend that while they intended the business to be successful, due to the reasons referred to earlier, the business failed.

Defendants correctly point out that failure to perform the promise or promises standing alone is not evidence that the offender did not intend to

perform, and that the State has the burden of proving that the defendants made their various promises knowing either that they did not intend to perform the promises or that they would not be performed as promised. Ill. Rev. Stat. 1971, ch. 38, par. 15—4(e).

There was testimony from one investor that for a time her distributorship made a profit and the trial court granted defendants' motion for a verdict of acquittal as to that count. However, the testimony from the remaining 12 complaining witnesses was replete with examples of defendants' failure to furnish the locations and merchandise of the quality promised; their refusal to deal with the complaints of their investors; and their refusal to provide the refunds as promised.

■■ Specific intent to defraud need not be proved by direct evidence but may be proved by the surrounding facts and circumstances; further, the factual issues are for the jury to determine and the jury's finding will not be disturbed unless the proof does not meet the requirements of the law. (*People v. Warren* (1971), 2 Ill. App. 3d 983, 276 N.E.2d 92.) In *Warren*, defendant was found guilty of theft by deception in connection with an agreement he had entered into with two investors to purchase interests in an oil well from defendant's oil company. Each of the investors claimed that they were then induced to enter into a new agreement for interests in two other oil wells, on the basis of defendant's alleged representation that the first well would be a productive one. The reviewing court there found that defendant had performed according to the promises in the agreement and that his representations of productivity of the first oil well, while both premature and contrary to later developments, did not render his conduct unlawful. However, in the case before us the evidence clearly showed that defendants here did not even attempt to honor their promises to their investors; there was sufficient evidence to infer that the failure of defendants' enterprise came not from over-enthusiasm or business "naiveté," but that the promises made were never intended to be fulfilled. Therefore, we hold that there was sufficient evidence to find the defendants guilty beyond a reasonable doubt.

Next, defendants contend that Joseph Spiezer, attorney for Orris Ballard and Serge Gaudry, should have been permitted to withdraw his representation from one or the other of them. On February 9, 1976, one week before the trial of this case was to commence, attorney Spiezer filed a motion to withdraw as attorney of record. The motion alleged in pertinent part:

"3. That JOSEPH P. SPIEZER has become aware of conflict of interest among the defendants and does not feel he can represent all defendants in this case.

4. That the defendant, ORRIS BALLARD, has not cooperated with JOSEPH P. SPIEZER and therefore JOSEPH P. SPIEZER does

not feel that he can adequately represent the defendant without his cooperation. * * *"

The motion was heard on February 16, 1976, the day of trial. At that time the following colloquy occurred:

"MR. SPIEZER: The problem I have, the first motion is in regard to Mr. Ballard is that recently a conflict has arisen. I don't know how I can explain them, without prejudicing your Honor. In the beginning—

THE COURT: Don't prejudice me, I will deny your motion. I have read the motion and I don't think it is well founded. This case has been continued, continued, continued, continued. I believe these are nothing more than harassing motions to stall the trial. * * * Motion to withdraw is denied. * * *"

During the course of the trial attorney Spiezer again brought up the question of a possible conflict of interest between the defendants. At that time the following colloquy took place:

"MR. SPIEZER: The problem is, Judge, I am representing Mr. Gaudry and Mr. [Orris] Ballard, and I have filed the motion previously. There may be some conflict, I think clearly a conflict has arisen and I am really concerned about what to do. On the witness stand in the State's examination, Mr. Gaudry, they have been dropping hints, more than dropping hints, they have been saying Ballard was, Orris Ballard was the 'brains behind the operation'. In my office Mr. Gaudry has maintained that no, he is, he said he was in charge.

THE COURT: I fail to see how that has been antagonistic to Orris Ballard.

MR. SPIEZER: My problem is, that things come out on the witness stand that do not come out perhaps in the lawyer's office. At this point in time I am not sure, but that perhaps Orris Ballard was the brains behind the operation so to speak, and if that is true, I have the obligation to go to Serge Gaudry and tell him, stick the finger at Orris. I can't do that because I represent Orris, * * * I think there is a clear conflict and I should withdraw from somebody. Frankly, I would prefer to withdraw from Orris Ballard. * * *

THE COURT: The trial at the stage we are at, I can't at this time allow you to withdraw and let Mr. Ballard defend himself. * * *

MR. SPIEZER: My problem, what happens if tonight I talked to Serge, well, yes, it wasn't the truth. * * * If the witness tells me I was covering for my father-in-law, you know, I feel bad about it.

THE COURT: Then you come and see me. * * * This indictment was brought back in August as I recall, and you had

since August to talk to these people, I presume you have talked to him many times.

MR. SPIEZER: Too often, Judge, * * *."

The United States Supreme Court recently considered the issue raised here in the case of *Holloway v. Arkansas* (1978), 435 U.S. 475, 55 L. Ed. 2d 426, 98 S. Ct. 1173. In *Holloway*, the three defendants were charged with robbery and rape; on August 5, 1975, the trial court appointed Hall, a public defender, to represent all three; on August 13, Hall moved the court to appoint separate counsel because the defendants had stated to him that there was a possibility of a conflict of interest in each of their cases. After a hearing on the motion the trial court denied it. On September 4, prior to the impaneling of the jury, Hall renewed the motion "on the grounds that one or two of the defendants may testify and if they do, then I will not be able to cross-examine them because I have received confidential information from them." The motion was again denied. During the trial Hall advised the court that àll three defendants had decided to testify and that as a result he would not be able to cross-examine any of them. Nor, as it turned out, was Hall able to conduct any direct examination of the defendants; each defendant proceeded to give unguided alibi testimony. On appeal to the Arkansas supreme court ((1976), 250 Ark. 260, 539 S.W.2d 435), the court observed that Hall had failed to outline to the trial court both the nature of the confidential information received from his clients, and the manner in which knowledge of that information created conflicting loyalties. Because none of the petitioners had incriminated co-defendants, the court concluded that the record demonstrated no actual conflict of interest or prejudice to the petitioners and affirmed their convictions.

On appeal, the United States Supreme Court reversed and remanded. The court noted that trial counsel's motions had focused explicitly on the probable risk of a conflict of interest and that the trial court then failed either to appoint separate counsel or take adequate steps to ascertain whether the risk was too remote to warrant separate counsel and held that the failure in the face of representations made by trial counsel before trial and again before the jury was impanelled, deprived petitioners of the guarantee of "assistance of counsel." To the argument that Hall might have presented a more vigorous request for separate counsel, in greater detail, the court responded that the trial court hardly encouraged the pursuit of the separate counsel claim and Hall would have been confronted with a risk of violating by more disclosure his duty of confidentiality to his clients.

However, more important for the case before us, the court went on to state:

"* * * When an untimely motion for separate counsel is made for dilatory purposes, our holding does not impair the trial court's ability to deal with counsel who resort to such tactics. [Citations.] Nor does our holding preclude a trial court from exploring the adequacy of the basis of defense counsel's representations regarding a conflict of interests without improperly requiring disclosure of the confidential communications of the client. [Citation.] In this case the trial court simply failed to take adequate steps in response to the repeated motions, objections and representations made to it, *and no prospect of dilatory practices was present to justify that failure.*" (Emphasis added.) 435 U.S. 475, 486-87, 55 L. Ed. 2d 426, 436, 98 S. Ct. 1173, 1180.

In the case before us, the first indication of a possible conflict of interest came when attorney Spiezer filed his motion to withdraw on February 9, 1976, one week before trial; the motion was heard on February 16, the day trial began. Attorney Spiezer had represented defendants Orris Ballard and Serge Gaudry since their arraignment the previous September; the trial date had been reset several times. The trial court itself expressed on the record that it felt the motion was a mere delaying tactic.

Defendants contend that the trial court denied the motion without permitting attorney Spiezer to explain the basis for the alleged conflicting and inconsistent defenses. The trial court did rather abruptly cut off discussion on the motion but only because attorney Spiezer indicated he might be revealing information which might prejudice the trial court. Considering both the motion to withdraw and the discussion between the trial court and attorney Spiezer at the time of the hearing, it is apparent that all attorney Spiezer was prepared to present were some vague and ill-defined suspicions that a conflict of interest might arise. Then, during the trial when attorney Spiezer again alluded to a "possible" conflict that "could" arise the trial court indicated that if the conflict did arise the attorney should again consult with the trial court. Since no further reference to this "possible conflict" appears in the record, it is only fair to assume that an actual conflict never developed; it was only after trial that the supposed conflict is again raised.

Unless a defendant properly establishes that a conflict of interest actually exists or becomes apparent during trial, the court should not indulge in speculation to determine whether separate counsel in the interests of justice is required. (*People v. Thompson* (1977), 51 Ill. App. 3d 53, 366 N.E.2d 375.) Unlike the situation in *Holloway* where the trial court was advised well in advance as to the nature of the conflict that had arisen, here the trial court on the date of trial was first presented with only

a vaguely defined "possibility" of a conflict arising, which amounted to no more than speculation on the part of attorney Spiezer who had represented the defendants for at least six months. Unlike *Holloway*, the trial court here stated that if a conflict actually existed, the attorney should consult with the trial court if the actual conflict developed. Finally, the supreme court made it clear that in *Holloway there was no prospect of the motion to withdraw being utilized as a delaying tactic* (emphasis ours); the record is much different here.

■■ We here conclude that the motion to withdraw, coming as it did at the time the trial was to commence and months after indictment and Spiezer's representation of the defendants, was untimely; that in view of the speculative nature of trial counsel's fears concerning a conflict of interest, the trial court took adequate steps in dealing with the motion, both at the hearing on the motion and again when the issue was raised at trial. Therefore we hold that the trial court did not err in denying the motion to withdraw.

Next defendants contend that the trial court committed reversible error when it refused to grant their motions for separate trials. The governing principle is that persons jointly indicted should be tried together unless their defenses are so antagonistic that a severance is necessary to insure a fair trial. (*People v. Henderson* (1976), 39 Ill. App. 3d 164, 351 N.E.2d 225.) The decision as to whether separate trials should be granted is a matter for the trial court's discretion. *People v. Davis* (1976), 43 Ill. App. 3d 603, 357 N.E.2d 96.

Defendants maintain that in the present case such antagonistic defenses were apparent. They argue that as intent was a major contested issue, in order to show his own freedom from guilt, any of the defendants could have presented evidence to show that full knowledge of the operations was solely within the knowledge of one of the other defendants. It is asserted that this theory was not advanced by any of the defense attorneys; therefore separate trials should have been granted.

The allegation of antagonistic defenses is not supported by the evidence. Mere apprehension that defenses may prove antagonistic without a showing that such apprehensions are well founded is an insufficient ground for severance. (*People v. Davis.*) During argument on defendant Russell's motion for severance, the attorney for Orris Ballard and Serge Gaudry commented:

> "Your Honor, I would point out for the record that my clients do not care if the case is tried separately or together with Mr. Russell. They feel that they have done nothing wrong and I don't think that it matters to them."

Again during opening statements the defense advanced the theme that AITC was a legitimate enterprise and the defendants' efforts to promote it

were honest and substantial. Defendants admit that the "blame theory" was never urged at trial. Therefore the antagonistic defenses claim is without merit.

However, defendants have further argued that even where antagonistic defenses are not present, defendants still have a right to a separate trial where a joint trial would be highly prejudicial to any of them. They maintain that the joint trial was highly prejudicial to them due to the introduction of other transactions admitted to prove intent, some of which did not involve all defendants. Prior to trial, the State indicated to the trial court that this evidence linked three of the defendants to other companies. The trial court was of the opinion that if the introduction of this evidence resulted in prejudice to any of the defendants, a mistrial would be declared as to those defendants. When the testimony was introduced, the trial court struck the testimony as to those defendants it did not relate to and admonished the jury to disregard it as to those defendants. Where the only ground for severance is that part of the testimony competent against one is incompetent against the other, there is no abuse of discretion in refusing a separate trial. (*People v. Mutter* (1941), 378 Ill. 216, 37 N.E.2d 790.) Therefore we conclude that no error was committed in denying a severance to defendants.

Defendants have also objected to the evidence of transactions involving other companies on the grounds that they were not similar to the transactions alleged in the indictment. Evidence which proves a face in issue is admissible though it may evidence that the accused has committed another separate crime. *People v. McDonald* (1975), 62 Ill. 2d 448, 343 N.E.2d 489.

Defendants rely on *People v. Romero* (1975), 31 Ill. App. 3d 704, 334 N.E.2d 305, *aff'd* (1977), 66 Ill. 2d 325, 362 N.E.2d 288. There the appellate court determined that a planned burglary of a sporting goods store as opposed to the burglary of a house, in a different city, approximately 24 hours after the burglary charged in the indictment, was not of such a similar nature as to fit the similarity requirement so as to allow evidence as to the planned burglary to show intent or common design. In the case before us defendants contend the following dissimilarities defeat the similarity requirement: that the other transactions occurred 6 to 18 months after the last date alleged in the indictment; different companies were involved while the 13 complaining witnesses were all involved with AITC; no direct connection was made between these companies and AITC; and in two of the ventures no refunds were promised.

We agree with the decision in *People v. Romero* in light of the facts there. There is however, a sizable difference in comparing the commission of two burglaries, and comparing the establishment of

several allegedly fraudulent business schemes. While 24 hours separating two burglaries may render them too remote, the time element must of necessity be longer to establish businesses the size of those outlined in the testimony. It is true that different named companies and merchandise other than tools were involved in these transactions and refunds were not promised in all instances; however, the testimony revealed that the basic ingredients of defendants' scheme in this case were contained in these other transactions. Nor is the fact that none of these other companies were themelves connected with AITC of any particular relevance. Therefore we conclude, with due regard for *People v. Romero*, that the case before us is factually distinguishable from that case, and we hold that the admission of evidence of the other transactions of similar design was not error.

Next, defendants contend that they were deprived of a fair trial due to the cumulative effect of errors committed at trial.

We have carefully examined these allegations of error and the arguments of both sides. We need not prolong this opinion with a discussion of each error individually. This was a two-week trial involving four defendants and a multitude of witnesses and evidence for both sides as evidenced by the 2500 pages of testimony. Given the length of the proceedings, as even the State would concede certain errors did occur. However, we are of the opinion upon viewing the trial as a whole, that no single error committed warrants reversal, nor do we agree with defendants' contention that their cumulative effect warrants reversal of the decision in this case. A conviction will not be reversed merely because error has been committed by the trial court unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error. (*People v. Sanchez* (1973), 11 Ill. App. 3d 1079, 297 N.E.2d 230.) In view of the amount of competent, relevant evidence of defendants' guilt introduced at trial, the guilty verdict returned by the jury could not be attributed to the cumulative effect of any trial errors.

Finally, defendants Larry Ballard and Serge Gaudry contend that their sentences are excessive. Larry and Orris Ballard and Gaudry each received sentences of two to eight years imprisonment. While Orris Ballard had a previous conviction for one count of mail fraud and one count of wire fraud in Federal district court, neither Larry Ballard nor Gaudry had any prior offenses and each had made application for probation. Defendants contend that the trial court's sole concern in imposing these sentences was the magnitude and seriousness of the offense, and gave no consideration to the potential for rehabilitation of these defendants as evidenced by the optimistic pre-sentencing reports.

Immediately prior to imposing sentence, the trial court stated:

"This case has been a protracted case, an unusual case. The jury

heard much testimony and they found three of the defendants guilty on Twelve (12) Counts and one defendant on Four (4) Counts. * * * There was theft in addition to this of some $362,000.00 or thereabouts, * * * As to ORRIS BALLARD, LAWRENCE BALLARD, SERGE GAUDRY, it is the conclusion of this Court that the seriousness of the offense, the nature and circumstances of the crime leave me no other alternative except to impose a sentence of imprisonment. * * *"

The trial court's exercise of judicial discretion in imposing sentence will not be disturbed on appeal absent an abuse of such discretion. (*People v. Perruquet* (1977), 68 Ill. 2d 149, 368 N.E.2d 882.) In *People v. Waud* (1977), 69 Ill. 2d 588, 373 N.E.2d 1, our supreme court held that the trial court had not acted arbitrarily in refusing to grant probation to a defendant because the sentencing court believed that the imposition of probation would have deprecated the serious nature and extent of the crimes. The supreme court stated:

"A crime need not be one of violence before it can be considered serious. The facts that a defendant has led a good life prior to his or her shortcomings and is not likely to repeat his or her failures again are factors to be considered by the trial court, but they are not conclusive factors. The State does not have a burden of producing empirical data to support the trial court's conclusion that probation will deprecate the seriousness of the offense. The court may reach such determination by examining all of the surrounding circumstances and drawing the reasonable inferences therefrom." 69 Ill. 2d 588, 595-96, 373 N.E.2d 1, 4.

■■ There was a lengthy presentencing hearing in which matters in aggravation and mitigation were heard. The sentences imposed were within the statutory limits. Considering the complete record we can not say that the imposition of these sentences on these defendants was an abuse of discretion.

At the time of oral argument of this case, the defendants filed a motion to stay our decision in this case pending the decision of our supreme court in *People v. Massarella* (1978), 72 Ill. 2d 531, ___ N.E.2d ___. In *People v. Massarella* (1977), 53 Ill. App. 3d 774, 368 N.E.2d 507, the Appellate Court for the First District held that the Attorney General's common law powers were not so broad as to allow him to take exclusive charge of the defendant's prosecution for conspiracy, theft and perjury, that the Attorney General is statutorily limited to assisting the state's attorney, upon request only. Like the defendant in *Massarella*, the defendants here were prosecuted by the Attorney General only.

■■ However, the supreme court has now reversed the appellate court decision (see *People v. Massarella* (1978), 72 Ill. 2d 531, ___ N.E.2d ___),

holding that in the absence of any objection by the state's attorney, the Attorney General is within the scope of his duties in conducting the prosecution of such cases and in appearing before the grand jury. On the basis of the supreme court's decision in *Massarella*, the Attorney General's prosecution of the defendants here, absent any objection from the state's attorney of Winnebago County, was proper.

The judgment of the circuit court of Winnebago County is therefore affirmed.

Affirmed.

SEIDENFELD, P. J., and RECHENMACHER, J., concur.