THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.*
CHARLES LINDGREN, Defendant-Appellant.

Fourth District   No. 17007

Opinion filed December 23, 1982.

Daniel D. Yuhas and Lawrence Bapst, both of State Appellate Defender's Office, of Springfield, for appellant.

Edmond H. Rees, State's Attorney, of Carlinville (Robert J. Biderman and Denise M. Paul, both of State's Attorneys Appellate Service Commission, of counsel), for the People.

JUSTICE MILLS delivered the opinion of the court:
A 75-year-old man was robbed and murdered.
His body was mutilated.
After a second trial, Lindgren was sentenced to 85-135 years.

We affirm.

Lindgren was charged with murder, armed robbery, and robbery. His original conviction was reversed by this court because prior-bad-acts testimony was erroneously admitted. (*People v. Lindgren* (1979), 68 Ill. App. 3d 141, 386 N.E.2d 87.) The supreme court affirmed and the cause was remanded for a new trial. *People v. Lindgren* (1980), 79 Ill. 2d 129, 402 N.E.2d 238.

A change of venue was allowed and jury trial began on January 20, 1981. The jury returned verdicts of guilty and Lindgren was sentenced to concurrent terms of 25-75 years for armed robbery and 85-135 years for murder. No sentence was imposed on the robbery conviction.

On this appeal, Lindgren alleges that the State's testimony referred to the exercise of his right to remain silent and his right to counsel, and informed the jury of his prior trial. Lindgren also claims: that he was denied the right to confront witnesses against him when his cross-examination of a State witness was limited; that letters admitted into evidence improperly called attention to his failure to testify; that the prosecutor's closing argument was improper and deprived him of a fair trial; and that the cumulative effect of all the errors deprived him of a fair trial. Although Lindgren raises no question as to the sufficiency of the evidence upon which he was convicted, a somewhat extended review is necessary to the resolution of the issues he does raise.

### FACTS

The State's case rested largely on the testimony of Lindgren's girlfriend, Ina Lewis. She testified that she and Lindgren spent the day together on April 17, 1977, traveling to Otter Lake, west of Girard, where Lindgren obtained a fishing license. They parted at 8:30 or 9 p.m., and the next time Ina saw Lindgren was when she was awakened by her mother and told that he wanted to speak to her. Ina's mother testified that the time was 2:30 a.m.

Ina arose and went outside. Lindgren, whom Ina characterized as being drunk, stated that he had killed her paternal grandfather and asked her to return with him to the deceased's residence in Girard. Lindgren was wearing an orange, blue, and white striped shirt, jeans, a blue or black jacket, and gloves. The shirt and gloves had blood on them. According to Ina, Lindgren pushed her into his car and drove towards Girard. On the way, she noticed a tire tool on the seat of the car and placed it on the floorboard.

Upon arrival at the deceased's residence, Lindgren took Ina by

the arm and led her, crying, to the house. She stood by while he searched, unsuccessfully, for a large sum of money reputed to be in the house. As they were leaving, defendant kicked the deceased in the ribs, made a crude remark about the deceased's genitalia being amputated, and stated that the deceased had "jumped" when his body was mutilated.

The two then left, wiping their feet on the grass on the way to the car. On their return trip to Virden, they became stuck in a ditch. Lindgren left his jacket and gloves in the car and he and Ina sought aid. They were initially unsuccessful but they eventually got a ride to Ina's mother's home. Defendant cautioned Ina not to say anything and forbade her to turn on any lights.

Ina's mother transported them to 995 North Grove, Virden—the residence of Ina's maternal grandmother and where Ina and Lindgren periodically resided.

At North Grove, the two went directly to a bedroom where Lindgren produced a wallet containing nearly $400. Ina identified the wallet as belonging to the deceased. When she inquired about what Lindgren had done, he related that he had gone to the deceased's house, entered with a key his stepson had stolen and given him, and demanded the deceased's money. When he was ordered out, a struggle ensued, and Lindgren—who was carrying a tire tool—struck the deceased in the head.

Lindgren then removed his clothes and instructed Ina to burn them and the wallet. Upon her return from performing this task, Lindgren was standing at the kitchen sink washing himself. He told her to wash their shoes, which she did. The two then retired. The next morning, with the assistance of Ina's mother, Lindgren found someone to extract his car from the ditch.

Ina testified that while waiting for the tow truck, Lindgren got something out of the passenger side of his car and walked a short distance down the railroad track that was nearby. Ina turned away and when she looked back, Lindgren was returning and the police were arriving. He told her to "be cool" and handed her a gun, wallet and keys. She put the wallet and gun underneath the seat of her mother's car. Ina and Lindgren were both arrested and charged with murder, armed robbery, and robbery.

Ina's testimony was substantially corroborated. The body of the deceased was as she described it. The cause of death was trauma to the head and resulting brain damage. The time of death was between 1 and 5 a.m. on April 18, 1977. The pathologist who testified for the State stated that in his opinion the amputation of the deceased's geni-

talia after death could have caused his body to jump or quiver. Scientific analysis established that hair strands similar to a sample of Lindgren's head hairs were found on the pants worn by the deceased. Blood on his jacket, the money found in his wallet, and the gun he gave to Ina was found to have similar characteristics to the deceased's blood, but dissimilar from Lindgren's. Lindgren's body was examined following the arrest and was cut or scraped on the biceps in a manner consistent with injury in a struggle. Also, a wallet, a Levi Strauss button, a zipper tab, and zipper teeth were found in the trash barrel at 995 North Grove, Virden.

Defendant and Ina's movements on the day of the crime were also corroborated. The operator of the concession stand at Otter Lake testified that Lindgren had purchased a fishing license from him at 5 p.m. Ina's mother testified that she saw Lindgren at her house and transported Ina and him to 995 North Grove, picked them up there the next morning, and took them to look for a tow truck. Chief Dalton of the Girard police testified that he saw Lindgren in Girard at 2 a.m. on the 18th. Two men testified that they picked up Ina and Lindgren between Virden and Girard and took them to Virden. Neither they nor Ina's mother saw Lindgren in good light that night; however, Ina's grandmother and uncle substantiated Ina's testimony as to the activities at 995 North Grove. Officer Malone testified that while on patrol at 3:40 a.m. on April 18, he noticed a fire in the trash barrel at that address and saw a shadow in the northwest window of the residence.

Physical evidence tending to support Ina's testimony included: a set of keys fitting the deceased's residence and his car found in the northwest bedroom of 995 North Grove; a handgun (which testimony established belonged to Lindgren's stepson) and a wallet containing $399 found in Ina's mother's car. Further, excerpts from letters written by Lindgren and sent to Ina while he was in jail were admitted into evidence. In them, Lindgren told Ina where they were and what they did on the night in question. The excerpts also stated that Ina should memorize the facts contained therein and testify to them at trial so both she and Lindgren could "win."

Lindgren's attempt to establish an alibi was also evidenced by a letter he wrote to Joann Branson, indicating that she should tell the police she saw Ina and him in Auburn at 11 p.m. on the night of the murder, and Branson's subsequent testimony that she had in fact not seen him at that time or place.

The testimony of Ina Lewis was not without some weaknesses, however. Ina testified that the charges against her had been reduced

to obstruction of justice after she made a statement to the State's Attorney and that she had been released on her own recognizance after pleading guilty to that charge. Also, Ina admitted that she hated her grandfather. She was unable to explain why—if Lindgren was covered with blood—he had openly sought her out, had sought aid when his car became stuck, and why—if she was afraid of him—she had never tried to run away or seek aid, and why she had written love letters to him while in jail.

The only evidence to contradict Ina, however, came from defense witness Cheryl Howell. She testified that she was incarcerated for a time with Ina and that during that time Ina admitted she had killed her grandfather and bragged that she was going to get away with murder by blaming it on her boyfriend. Ina denied making these statements.

## I

The first issue raised by Lindgren regards the testimony of Trooper Michael Koval and Detective Randall Rushing. In the course of examination of these witnesses, the State inquired as to Lindgren's initial interrogation. Trooper Koval related Lindgren's comments (that he had been fishing all night and didn't know what was going on) and indicated that Lindgren requested counsel. Rushing related that after being given *Miranda* warnings, Lindgren had also made a statement about being out fishing but had declined to say anything further.

It is clearly error to comment on a defendant's post-arrest silence or his exercise of his right to counsel. (*Doyle v. Ohio* (1976), 426 U.S. 610, 49 L. Ed. 2d 91, 96 S. Ct. 2240 (holding that defendant's exercise of his right, after being given *Miranda* warnings, was insoluably ambiguous); *People v. Kennedy* (1975), 33 Ill. App. 3d 857, 338 N.E.2d 414 (holding that it was plain error to elicit testimony of defendant's exercise of his right to counsel and to comment upon it in closing argument).) However, both *Doyle* and *Kennedy* are factually dissimilar to the case at bar. In both cases, the offending testimony was argued by the prosecution as an indicia of guilt. Here, it is apparent that the prosecutor was in each instance not trying to elicit testimony that the defendant had exercised his constitutional rights, but that he had made statements prior to doing so.

■ It is not error to elicit a complete recitation of police procedure, even if the recitation includes reference to a defendant's exercise of his constitutional rights, so long as the recitation is not argued to be indicative of guilt. (*People v. LaSumba* (1980), 92 Ill. App. 3d 621, 414 N.E.2d 1318, *cert. denied* (1981), 454 U.S. 849, 70 L. Ed. 2d

138, 102 S. Ct. 170; *People v. Martinez* (1980), 86 Ill. App. 3d 486, 408 N.E.2d 358; *People v. Foster* (1980), 81 Ill. App. 3d 915, 401 N.E.2d 1221.) Because the State did not elicit the testimony to establish guilt and did not capitalize upon it in closing argument, no error occurred.

## II

Lindgren's second assignment of error also involves testimony of Ina Lewis. On direct examination, she was asked when and how long she was incarcerated in connection with the murder of her grandfather. She responded, "Until April 18, until after Charlie's trial it was October or sometime I think when I got out in November."

■ This reference to defendant's previous trial was inadmissible evidence of prior bad acts. Although defendant's objection was a bit delayed, the error is preserved here. However, in view of the overwhelming evidence of defendant's guilt, we find the error to be harmless. (See *People v. Zynda* (1977), 53 Ill. App. 3d 794, 368 N.E.2d 1079 (holding that repeated and unnecessary reference to a fingerprint card defendant had made on a previous occasion was error, but did not require reversal of his conviction).) The case for harmless error is even stronger here, because the reference was not unnecessarily repeated, but was isolated and apparently inadvertent. And, this situation is distinguishable from *People v. Goodwin* (1979), 69 Ill. App. 3d 347, 387 N.E.2d 433, which held that inadvertent references did not negate the harm to defendant. Here, the State was retrying a defendant whose first conviction had been reversed because this same type of evidence was admitted. The record revealed that all parties were otherwise very careful to avoid reference to the previous trial. It is unlikely that the reference was planned or premeditated. See *People v. Nelson* (1973), 12 Ill. App. 3d 67, 298 N.E.2d 256 (isolated reference to "another victim" did not require reversal).

Finally, the evidence against Lindgren was strong. The testimony of Ina Lewis directly implicated him and her testimony was substantially corroborated by other testimony, by physical and scientific evidence which linked defendant to the crime, and by letters written by defendant and introduced into evidence which show defendant's consciousness of guilt in his attempt to establish an alibi. Reversal is not required by this error.

## III

Lindgren's next contention is that he was deprived of his right to confront witnesses against him and denied a fair trial when he was

prohibited from cross-examining Ina Lewis regarding a juvenile adjudication.

A defendant's right to confront the witnesses against him is fundamental to a fair trial. (*Pointer v. Texas* (1965), 380 U.S. 400, 13 L. Ed. 2d 923, 85 S. Ct. 1065.) An essential part of the right to confront is the right to cross-examination. (*Chambers v. Mississippi* (1973), 410 U.S. 284, 35 L. Ed. 2d 297, 93 S. Ct. 1038.) Further, *Davis v. Alaska* (1974), 415 U.S. 308, 39 L. Ed. 2d 347, 94 S. Ct. 1105, and *People v. Norwood* (1973), 54 Ill. 2d 253, 296 N.E.2d 852, indicate that a juvenile witness may be impeached by examination regarding pending juvenile matters or matters for which the witness was under the continuing supervision of the juvenile court. The stated rationale is that a defendant has the right to show bias on the part of a witness against him. That is, he may show that the juvenile witness is predisposed to testify favorably to the State in order to receive lenient treatment on the juvenile matters.

However, *Davis* and *Norwood* do not apply in the present situation. First, delinquency adjudications are admissible under certain circumstances to impeach a witness because *In re Gault* (1967), 387 U.S. 1, 18 L. Ed. 2d 527, 87 S. Ct. 1428, eliminated the informalities and the departures from accepted standards for criminal trials in juvenile proceedings. Prior to *Gault*, juvenile adjudications were considered to lack the general probative value of a criminal conviction. The adjudication Lindgren sought to use was one of neglect. Section 4—6 of the Juvenile Court Act provides that the standard of proof and the rules of evidence in a *civil* proceeding apply to neglect proceedings under the Act. (Ill. Rev. Stat. 1981, ch. 37, par. 704—6.) Thus, the *Gault* rationale does not apply and the evidence is inadmissible. See *People v. Puente* (1981), 98 Ill. App. 3d 936, 424 N.E.2d 775.

Second, even if Lindgren had sought to use a delinquency adjudiction, the reason for the holding of *Davis* and *Norwood* is absent here. There is no showing that Ina Lewis expected leniency or favorable treatment in the juvenile proceeding because of her testimony. On the contrary, there was no showing that she was still under the authority of the juvenile court at the time of her testimony. See *People v. Clark* (1977), 55 Ill. App. 3d 379, 370 N.E.2d 1111, *cert. denied* (1978), 439 U.S. 858, 58 L. Ed. 2d 165, 99 S. Ct. 173.

■ Finally, in determining whether a defendant has been denied the right to confront witnesses against him, a court must look to what was allowed, not what was prohibited. (*People v. Baugh* (1981), 96 Ill. App. 3d 946, 422 N.E.2d 166.) If the jury is made fully aware of all the factors concerning the relevant areas of impeachment, there is no

denial of the right to confront. The jury was told that Lewis had pleaded guilty to reduced charges and had been released on her own recognizance in exchange for her testimony. They were fully aware of any bias, interest, or motive to testify falsely. The evidence of Ina's neglect adjudication would not have added significantly to their store of knowledge and no error occurred. See *People v. Yancey* (1978), 57 Ill. App. 3d 256, 372 N.E.2d 1069.

## IV

Lindgren next argues that the admission into evidence of the letters he wrote to Ina Lewis while he was in jail impermissibly called attention to his failure to testify. Specifically, Lingren complains of the following excerpt:

"Study it, memorize it all. Study and memorize it all. The times and everything I said. Cause that's what we did and if I get on the stand our storys [*sic*] are gonna have to be the same, unless you tell me you got scared and told em wrong."

In general, comment upon a defendant's failure to testify is reversible error. (*Griffin v. California* (1965), 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229; *People v. Potter* (1974), 20 Ill. App. 3d 1049, 314 N.E.2d 201.) The error occurs even if the comment is indirect. (*Potter.*) However, this case falls within an exception to the general rule. Assuming that the letter constituted a reference to defendant's failure to testify (and we do not hold that it does), it is not to be viewed with the same suspicion as a comment made in closing argument. *People v. Seel* (1979), 68 Ill. App. 3d 996, 386 N.E.2d 370 (comment made in opening statement).

Lindgren claims that when he did not take the stand, the jury was left to wonder why he stood mute. While this is undoubtedly true, the question is more likely planted in the jury's mind by the failure to testify itself, and not any reference in a letter read during the prosecution's case in chief. Thus, there was no error.

## V

Lindgren also claims that he was denied a fair trial when the prosecution made the following remarks in rebuttal:

"Ladies and Gentlemen, you've heard defense counsel's theory about this, and I suggest to you that they are pulling these inconsistencies like a magician pulls rabbits out of his hats. I also suggest to you that once you realize how the trick is done you find out that there's a very simple explanation for it and what looks like magic is simply an illusion. They are trying to

present illusions to you and to get you away from the actual facts and the facts of how these things were actually done."

Counsel then attempted to explain inconsistencies raised by defense counsel and concluded:

"The question is do you disbelieve everything that has been presented here? Do you disbelieve the testimony of Ina Lewis and believe solely the testimony of Cheryl Howell? I would submit to you that the testimony of Ina Lewis has been undisputed."

■ A reading of the cases reveals that it is not so much what the prosecutor says, but whether his comments find support in the record that determines whether or not error occurred. Compare *People v. Weathers* (1975), 62 Ill. 2d 114, 338 N.E.2d 880, and *People v. Suggs* (1977), 50 Ill. App. 3d 778, 365 N.E.2d 1118, with *People v. Weaver* (1972), 7 Ill. App. 3d 1104, 288 N.E.2d 669.

This court has adopted the same position. In *People v. Moore* (1979), 71 Ill. App. 3d 451, 389 N.E.2d 944, references to defense tactics as being a smoke screen and clouding the issues were held permissible because defense counsel had claimed a prosecution witness' testimony was untrue. The court said that the defendant could not complain when the prosecution argued in response. And, in *People v. Griggs* (1977), 51 Ill. App. 3d 224, 366 N.E.2d 581, comments such as occurred here were held to be permissible when they were designed to point out to the jury that defense counsel's argument was comprised of attempts to emphasize minor inconsistencies in the testimony of witnesses for the prosecution.

■ Taken in context, the prosecutor's remarks here were proper. Defense counsel's argument had pointed out minor inconsistencies in prosecution testimony. The State was simply responding to this argument. The response was based on the record, and while it did employ some poetic license, it was not inflammatory. See also *People v. Hicks* (1981), 101 Ill. App. 3d 238, 427 N.E.2d 1328, and *People v. Ortiz* (1976), 44 Ill. App. 3d 124, 357 N.E.2d 1270.

Lindgren further claims that the above-quoted portion of the prosecutor's closing argument, in referring to the testimony of Ina Lewis as undisputed, improperly drew attention to his failure to testify. This argument is without merit. *People v. Smith* (1978), 67 Ill. App. 3d 672, 385 N.E.2d 44, held that there was nothing improper in characterizing a prosecution witness' testimony as uncontradicted even though the defendant was the only person who could contradict it. Further, *Smith* held that a witness' testimony may properly be characterized as undisputed even though it may contain minor inconsisten-

cies.

While the credibility of Ina Lewis is subject to debate, the only evidence which can be said to dispute her testimony is that of Cheryl Howell. A fair reading of the prosecutor's rebuttal argument reveals that she was simply trying to point out this fact to the jury and to argue that the testimony of Cheryl Howell was not worthy of belief. This being the case, the testimony of Ina Lewis could properly be characterized as undisputed.

Also, since it was the credibility of Cheryl Howell and not the defendant which was pitted against that of Ina Lewis, the prosecutor's rebuttal cannot be construed as referring to the defendant's failure to take the stand. Even if it can be so characterized, the State correctly points out that Lindgren did not object to this argument. Any error has thus been waived. (*People v. Jackson* (1981), 84 Ill. 2d 350, 418 N.E.2d 739.) Further, as the evidence here was not closely balanced, and because this error is not of such a magnitude as to deprive defendant of a fair trial, there is no need to consider it under the plain error doctrine. *Jackson.*

## VI

Finally, defendant argues that the cumulative effect of the errors which occurred at his trial require reversal of his conviction even if no single error was sufficient. The doctrine of cumulative error is an ethereal, elusive concept—one so subjective and intangible that it is infrequently applied and viewed with skepticism. See *People v. Sullivan* (1977), 48 Ill. App. 3d 787, 362 N.E.2d 1382.

■ Even so, *People v. Patterson* (1976), 44 Ill. App. 3d 894, 358 N.E.2d 1164, and *People v. Killian* (1976), 42 Ill. App. 3d 596, 356 N.E.2d 423, on which defendant relies, are distinguishable. In both cases, the defendant raised reasonable doubt as an issue on appeal. Here, he does not. In *Killian,* this court indicated that the effect of the doctrine was that small errors take on relatively greater significance where the evidence against the defendant is weak. Because the evidence against defendant here was strong, the doctrine does not apply.

This position is reinforced by *People v. Ballard* (1978), 65 Ill. App. 3d 831, 382 N.E.2d 800, *cert. denied* (1979), 444 U.S. 925, 62 L. Ed. 2d 180, 100 S. Ct. 262, which refused to find cumulative error where it did not appear that real justice was denied or that the verdict resulted from the error.

> "However, we are of the opinion upon viewing the trial as a whole, that no single error committed warrants reversal, nor

do we agree with defendants' contention that their cumulative effect warrants reversal of the decision in this case. A conviction will not be reversed merely because error has been committed by the trial court unless it appears that real justice has been denied or that the verdict of the jury may have resulted from such error. (*People v. Sanchez* (1973), 11 Ill. App. 3d 1079, 297 N.E.2d 230.) In view of the amount of competent, relevant evidence of defendants' guilt introduced at trial, the guilty verdict returned by the jury could not be attributed to the cumulative effect of any trial errors." (65 Ill. App. 3d 831, 842, 382 N.E.2d 800, 809.)

This case presents a situation similar to *Ballard*.

Finding no merit in any of the issues raised by the defendant, we affirm.

Affirmed.

TRAPP and LEWIS, JJ., concur.